ALAN M. GLAZER ET AL. *v.* DRESS BARN, INC.
(SC 17228)

Norcott, Katz, Palmer, Vertefeuille and Zarella, Js.

Argued November 23, 2004—officially released June 7, 2005

*Wesley W. Horton*, with whom were *Robert M. Shields, Jr.*, *Michael S. Taylor* and, on the brief, *Kenneth J. Bartschi*, for the appellant-appellee (defendant).

*Peter N. Wang*, pro hac vice, with whom were *Ben A. Solnit*, *Robert B. Flynn* and, on the brief, *Dorit S. Heimer*, for the appellees-appellants (plaintiffs).

*Opinion*

KATZ, J. The defendant, Dress Barn, Inc. (Dress Barn), and the plaintiffs, Alan M. Glazer, GLZR Acquisition Corporation (GLZR) and BFI Liquidating Limited (BFI), respectively appeal and cross appeal from the judgment of the trial court, rendered after a jury trial, in favor of the plaintiffs on claims of breach of contract, negligent misrepresentation and violations of the Con-

necticut Unfair Trade Practices Act (CUTPA); General Statutes § 42-110a et seq.; awarding $30 million in compensatory damages. The defendant claims that the evidence was insufficient to support the judgment on each of these claims and that the trial court improperly: (1) charged the jury on the statute of frauds, General Statutes § 52-550, and on damages; (2) modified its decision on postjudgment interest; and (3) sanctioned the defendant for a discovery violation by striking certain testimony. The plaintiffs claim on cross appeal that the trial court improperly denied their application for prejudgment interest. We conclude that the jury charge was improper with respect to the statute of frauds and that there was insufficient evidence to support the verdict. Accordingly, we reverse the judgment of the trial court.

The jury reasonably could have found the following facts. Bedford Fair Industries (Bedford Fair), a general partnership, is a private direct mail marketer of moderately priced women's apparel through seasonal catalogs. At all relevant times, GLZR and BFI were the sole partners in Bedford Fair. Glazer was one of the founders of Bedford Fair and its president; he also was the majority shareholder of GLZR and BFI. In late 1995, Bedford Fair began to explore the possibility of selling the company to an appropriate strategic partner, while keeping Glazer and his management team to run the operation.

Dress Barn operates a chain of women's retail apparel stores, with 726 stores nationwide as of 1997. It decided to expand its operation by entering into the catalog mail order business and determined that the most cost effective option was to buy an existing mail order company that could provide customer lists, shipping facilities and expertise in that business.

In late 1996, Glazer contacted David Jaffe, Dress Barn's then senior vice president, about the possibility

of Dress Barn acquiring Bedford Fair.[1] Executive officers for the two companies met on December 6, 1996, and January 10, 1997, to discuss the merits of such a proposal. At these meetings, Bedford Fair provided Dress Barn with confidential financial information, including sales and profit data for the previous two years, monthly revenue projections for 1997 and annual revenue projections for 1997 through 2001. The 1996 balance sheet reflected an outstanding debt of $8.4 million owed to the Bank of New York (bank), and Bedford Fair explained that it was virtually fully drawn on its line of credit with the bank. The 1996 balance sheet also reflected Bedford Fair's monthly cash flow, which indicated that its expenses exceeded its revenues in certain months, including August. Although the data reflected operating losses for 1995 and 1996, and a projected loss for 1997,[2] the five year projections reflected a return to profitability in late 1997 and future growth. Dress Barn understood that these projections assumed that Bedford Fair's "credit crunch" would be relieved.

Part of the increased profit projections was based on successful testing results Bedford Fair had achieved, on a limited scale for the two previous seasons, from a deferred billing program. Under this program, Bedford Fair offered its customers the option of receiving merchandise immediately upon ordering while deferring payment for the goods for approximately two months.[3] At the January 10, 1997 meeting, Bedford Fair shared the test results of the deferred billing program with Dress Barn.

---

[1] Glazer had entered into negotiations earlier that year with Dress Barn regarding an acquisition, but the parties could not agree on terms at that time.

[2] Glazer testified that Bedford Fair had operating losses of approximately $4 million in 1995 and $4.9 million in 1996.

[3] The catalog set a fixed billing date; therefore, the length of the deferral period depended on when the customer placed the order. For example, Bedford Fair's fall catalog, which it mailed initially in late June, set a billing date of October 10, 1997, for all purchases made by August 30, 1997. Later mailings had billing dates of November 4 and December 4, 1997.

Dress Barn thereafter sent Bedford Fair a proposed "Fair Term Sheet" (term sheet), dated February 7, 1997, setting forth certain key components of the proposed acquisition of Bedford Fair. The terms included, inter alia, a $20 million purchase price based on "certain debt level assumptions," Dress Barn's assumption of $5 million of Bedford Fair's bank debt, Glazer's continuation as chief executive officer, and an equal allocation of tax savings arising from the sale.

On March 28, 1997, the parties met to discuss the acquisition terms, at which time Glazer expressed general agreement with the terms set forth in the term sheet. At the March 28 meeting, Bedford Fair reported that it had exceeded its income projections for January and February, and that it anticipated exceeding its March projections as well. It also shared with Dress Barn the results from its expanded testing of the deferred billing program in its spring catalog, which had been quite successful. Bedford Fair noted that it did not think it would be able to support the deferred billing in its fall catalog because of cash flow problems in July and August. Bedford Fair explained that, although the program ultimately would increase revenues significantly, the reduced cash flow in late July and August while billing was deferred would impact its ability to pay creditors during that period. Moreover, Bedford Fair would incur higher costs from running the deferred billing program because, in anticipation of greater response rates, it would need to print and mail more catalogs and order more merchandise.

Bedford Fair inquired whether Dress Barn would be willing to provide financing so that Bedford Fair could continue and expand the deferred billing program in its fall catalog. Because the parties had set late July, 1997, as the target acquisition date, Bedford Fair explained that, if Dress Barn were to acquire Bedford Fair, the benefits of the deferred billing would accrue

to Dress Barn as the deferred charges subsequently were processed. Dress Barn would derive a further benefit from an anticipated higher customer response rate, which then would allow it to have a broader mailing for the winter 1997 catalog. Glazer told Dress Barn that, if it decided not to provide the financing, Bedford Fair either would suspend the deferred billing program or would look to another source for financing so that it could continue the program. Glazer indicated that Bedford Fair was fully extended on its $8.5 million line of credit with the bank, and that the bank would not provide the additional financing, unless he provided a personal guarantee, which Glazer was unwilling to do.[4] Glazer made it clear that Dress Barn would need to provide the financing only if the sale did not go through by the end of July as they anticipated. Bedford Fair noted that it needed a commitment soon to make timely printing commitments. Jaffe indicated that the proposal made sense and that he would get back to Bedford Fair as to whether Dress Barn would provide the financing.

On April 4, 1997, the parties met to negotiate a letter of intent for the acquisition. The parties agreed at that time that Dress Barn would determine the methodology for calculating the purchase price, but Bedford Fair would set the date on which Bedford Fair's stock value would be determined.

At the April 4 meeting, Jaffe agreed that Dress Barn would provide financing to support the deferred billing program. He indicated that Dress Barn wanted Bedford Fair's efforts expended toward running the business rather than looking for alternative sources of financing. Jaffe also noted his understanding that the financing would be necessary only if the sale did not go through. The parties then shook hands on the deal. Bedford Fair

[4] Glazer already had executed a personal guarantee for $5.7 million of Bedford Fair's obligations.

asked to have the financing agreement in writing, but Jaffe asked to defer memorializing both the financing agreement and the letter of intent until after completion of a pending secondary stock offering so that they would not have to include the transaction details in the stock prospectus.

On May 23, 1997, after the stock offering had been completed, the parties signed a letter of intent setting forth certain principal terms of Dress Barn's acquisition of Bedford Fair consistent with the February term sheet and a closing date of "July 28, 1997 or as soon as practicable thereafter." An exhibit setting forth a formula for calculating the purchase price was attached to, and incorporated by reference in, the letter of intent. The parties agreed therein that the letter of intent was not a binding agreement, which would result only from the execution of future definitive agreements and approval of the transaction and agreements by Dress Barn's board of directors. The parties expressly exempted from that disclaimer certain paragraphs of the agreement, which were to be legally binding upon the parties. One of those paragraphs provided that Dress Barn "anticipates being able to conduct the necessary 'due diligence' investigation and negotiating and executing definitive agreements by June 30, 1997."[5] Another paragraph precluded Bedford Fair from soliciting or negotiating with any third parties with respect to the sale of its business or any of its assets until June 30, 1997. Dress Barn similarly agreed therein not to negotiate with third parties during that period.

---

[5] Jaffe testified that he understood the term "due diligence" to encompass three elements. First, "business due diligence" examines whether the business at issue provides a good product or service and what the business' position is in the marketplace. Second, "financial due diligence" examines the financial soundness of the business and the reliability of the financial data they have been given. Third, "legal due diligence" examines whether the business has been created and run in compliance with the legal requirements of such a business.

In letters dated May 27, 1997, David Mackey, Bedford Fair's chief operating officer, informed Bedford Fair's two principal creditors, the bank and R. R. Donnelly and Sons Company (Donnelly),[6] that the parties had executed a letter of intent. Mackey also informed them therein that Bedford Fair had received an opportunity to finance its deferred billing receivables under certain terms and conditions. Mackey's letter set forth certain terms related to the financing and noted that "[c]ounsel advises us that inter-creditor agreements will have to be put in place in order to finalize this arrangement."

On May 29 and 30, two of Dress Barn's executives and representatives from its accounting firm toured Bedford Fair's distribution center and inventory annex, at which time one of the executives, Reid Hackney, generated an inventory report. The report noted several problems facing Bedford Fair: a down trending market share, significantly higher back orders, and serious cash flow problems. Hackney opined therein that, "without an infusion of cash from [Dress Barn] or new bank financing [Bedford Fair] will go under." Hackney, who had not attended the April 4 meeting, further noted: "[Bedford Fair] has asked for [a] $4 million line [of credit] from [Dress Barn] to be available [as soon as possible]. We would like to hold off until after our fiscal year-end (7/26/97). [Bedford Fair] can't wait that long. [Dress Barn] realizes [its] negotiating position and wants [Glazer's] personal guarantee on line."

Before and after executing the letter of intent, on May 19 and June 3, 1997, Dress Barn reassured Bedford Fair that documents to support the financing agreement would be forthcoming. At the June 3 meeting, Bedford Fair reminded Dress Barn that the catalogs offering the

---

[6] Donnelly was the printer for Bedford Fair's catalogs. As of May 27, 1997, Bedford Fair had an outstanding loan of $10 million with Donnelly.

deferred billing would be printed the following week.[7] In a subsequent conversation before the catalogs were printed, Jaffe assured Glazer that Dress Barn would provide the financing, noting, "God forbid we don't close on the [acquisition] deal or it's delayed, then we induced [you] to do deferred billing and we're not going to leave you hanging out there."

In early June, Dress Barn discovered that, under the formula the parties had agreed to, its acquisition costs for the purchase of Bedford Fair would be at least $5 million higher than the $25 million Jaffe had represented to Dress Barn's board of directors and its investors.[8] On June 19, after a meeting with Steven Kirshenbaum, Dress Barn's counsel, Jaffe noted Dress Barn's strategy to "not give any indication [to Bedford Fair] that we have . . . reconsidered or changed our mind."

On June 23, 1997, Jaffe informed Glazer that Dress Barn would not support the deferred billing program. He indicated that Dress Barn perceived certain risks to the financing that it was unaware of when it had made the commitment. Specifically, Jaffe indicated that Dress Barn then realized that Bedford Fair was experiencing a credit problem rather than a cash flow problem. Therefore, even if Dress Barn had security for the loan, it still could be at risk if Bedford Fair were, under the worst case scenario, to file for bankruptcy. Glazer noted that Jaffe was aware of these risks when he had made

[7] In his deposition, Jaffe conceded that, during conversations in May, Glazer had alerted Jaffe to the fact that Bedford Fair would be printing the deferred billing catalogs in June and that Bedford Fair needed to be sure of Dress Barn's commitment to provide financing, because Bedford Fair could not change its plan to provide deferred billing after the catalogs had been printed. Jaffe also confirmed in his testimony that Glazer called him just before Bedford Fair mailed the catalogs, to insist on a firm commitment so Bedford Fair could decide whether to go forward with the deferred billing. Jaffe, however, denied making any commitment.

[8] The plaintiffs contend that Dress Barn's revised estimate was $33 million. The evidence they cite, however, reflects an estimate of $30.5 million.

the financing commitment. He also told Jaffe that the withdrawal of financing could have a significant effect on Bedford Fair over the following two months. Jaffe responded that, although Dress Barn would not provide the financing, it still would seek to close on the sale as close to July 28 as possible.

On June 24, after receiving information from its accounting firm that the costs of sharing tax benefits from the sale with Bedford Fair would cost Dress Barn approximately $3.2 million, Dress Barn decided to revise substantively the sale agreement so it no longer would share the tax benefits with Bedford Fair. By July 7, Dress Barn determined that it needed to devise some rationale for withdrawing that benefit.

In a conference call on July 11, 1997, Jaffe reiterated that Dress Barn was moving "with Godspeed" to complete the transaction. He also informed Bedford Fair that some issues had come up that Dress Barn was concerned about, but nothing substantial enough to affect the pending transaction. Jaffe would not elaborate on what those issues were. By this time, Bedford Fair had received a draft of the sale agreement and an employment agreement, but not a stock purchase agreement.

At a July 30 meeting to finalize the sale agreement, Jaffe stated that Dress Barn had agreed to certain terms in the letter of intent that were based on certain misunderstandings and, therefore, the parties needed to make changes to the acquisition terms. Among the changes was the withdrawal of the shared tax benefit, as well as the elimination of Glazer's incentive compensation package, together worth more than $5 million. Glazer indicated a willingness to finalize the terms, despite these substantive changes, but Jaffe declined to do so.

Since July 1, 1997, Bedford Fair had expended significant, but ultimately unsuccessful, efforts toward finding

other sources to provide financing for the deferred bill-ing program.[9] It had waited until that date in order not to violate the terms of the letter of intent, which precluded Bedford Fair from negotiating with third par-ties regarding the disposition of any of its assets until after June 30, 1997. On August 10, Bedford Fair ran out of cash to pay its bills as customers exercised their option to defer payment on catalog orders. Vendor ship-ments began to slow down to Bedford Fair as a result.

When the parties met again on August 14, Dress Barn further reduced its initial purchase price from $25 million to approximately $13.7 million, according to Bedford Fair's best estimate. Glazer indicated his will-ingness to accept the deal, in light of Bedford Fair's precarious financial condition, but Jaffe would not final-ize the terms of the sale until Dress Barn could confirm the accuracy of Bedford Fair's projected August 24 bal-ance sheet, on which its offer had been based. Upon Glazer's request, Jaffe agreed that Dress Barn would keep open its offer to set the price based on the pro-jected August 24 balance sheet until August 22.

On August 20, vendors began to stop shipping goods to Bedford Fair after hearing rumors in the market that Bedford Fair had filed for bankruptcy. On August 21, because David Jaffe was out of the country, Glazer called Elliott Jaffe, David Jaffe's father and Dress Barn's then chief executive officer, to inform him of this turn of events. Glazer indicated that Bedford Fair would accept the terms set forth at the August 14 meeting. Elliott Jaffe indicated that this offer was "last week's deal" and now "off the table." Upon confirming Glazer's claim, however, that David Jaffe had agreed to hold the offer open until August 22, Elliott Jaffe agreed to the

---

[9] Glazer testified that Bedford Fair did receive a tentative offer of financing from one company on August 20, 1997. Bedford Fair did not accept that offer because the transaction could not be completed in time to address the immediate problem of vendors demanding payment.

August 14 sale terms. Elliott Jaffe insisted that there would be no more changes to those terms.

Despite Elliott Jaffe's statement, on August 22, Dress Barn contacted Bedford Fair to inform it that there would be further changes to the sale terms in revised documents that would be forthcoming. Upon receiving the revised documents, which contained terms further affecting the purchase price, Bedford Fair became concerned that these changes might not leave any money to be distributed to its shareholders upon the sale of the company. On August 25, Armand Correia, Dress Barn's chief financial officer, called Mackey regarding the pending agreements and indicated that Dress Barn was adamant that the substantive elements of the agreement needed to be finalized essentially as written in the revised documents.

Rather than accept these terms, on September 2, 1997, Bedford Fair filed for bankruptcy protection. Dress Barn thereafter attempted to buy Bedford Fair's assets out of bankruptcy, but ultimately all of Bedford Fair's assets were sold to another direct marketing company. After the proceeds of the sale were used to pay Bedford Fair's creditors and the bankruptcy expenses, Bedford Fair's estate was left with approximately $899,000 to be distributed to its shareholders.

The record reveals the following additional facts and procedural history. In May, 2000, the plaintiffs initiated this action. In the operative complaint, the plaintiffs asserted seven counts: (1) a CUTPA violation for the totality of Dress Barn's conduct causing Bedford Fair's bankruptcy; (2) failure to negotiate the acquisition agreement in good faith under New York law;[10] (3) negligent misrepresentation with respect to the letter of intent; (4) a CUTPA violation with respect to a breach

[10] The parties had provided in the letter of intent that it shall be construed in accordance with the laws of New York.

of the oral contract to provide financing; (5) breach of contract; (6) negligent misrepresentation with respect to the financing agreement; and (7) promissory estoppel. The plaintiffs' theory of the case was that Dress Barn devised a plan, some time before it withdrew its commitment to finance the deferred billing program, to place Bedford Fair in a state of financial crisis by withdrawing the financing so Dress Barn could purchase Bedford Fair at an unreasonably low price.

Thereafter, Dress Barn filed a motion for summary judgment on all counts. The trial court granted the motion only with respect to count two, failure to negotiate in good faith, and denied the motion as to the other counts. After the plaintiffs presented their case-in-chief at trial, Dress Barn moved for a directed verdict. The trial court granted the motion in part and denied the motion in part, directing a verdict in favor of Dress Barn on count six, negligent misrepresentation with respect to the financing agreement, and on count seven, promissory estoppel.[11] The jury subsequently returned a verdict in favor of the plaintiffs on the four remaining counts, awarded $30 million in compensatory damages and determined that the plaintiffs were entitled to punitive damages on the breach of contract claim.[12] Dress

---

[11] The trial court concluded, with respect to count six, that the plaintiffs had not adduced evidence of a misrepresentation of an existing or past fact, a necessary element in the absence of a claim of fraud, with respect to Dress Barn's promise to provide financing for the deferred billing. The trial court granted the motion for a directed verdict with respect to count seven, promissory estoppel, on the ground that the cause of action is predicated on the absence of consideration, and Dress Barn was not claiming that the plaintiffs offered nothing in exchange for its willingness to make a loan.

[12] On the verdict form, the jury entered $30 million as damages to be awarded on count one, entered no damage amount on the other counts and indicated in a note above that figure: "This amount to be awarded on all counts totaled." In light of the trial court's instructions on damages, we construe the jury's statement to mean that they determined that the plaintiffs suffered the same loss on each count and thus entered the amount only once, rather than that the $30 million was a cumulative figure from varied damages on each count. Therefore, we must consider whether any of the four counts could support the jury's verdict.

Barn moved to set aside the verdict and for remittitur. The plaintiffs moved for prejudgment and postjudgment interest on the compensatory damages award, attorney's fees and punitive damages. The trial court denied all of Dress Barn's motions. The trial court granted the plaintiffs' motions with respect to attorney's fees and postjudgment interest on the compensatory damages, but denied the request for prejudgment interest. The trial court later corrected its decision to include postjudgment interest on the award of attorney's fees. The trial court declined to award punitive damages because it found that Dress Barn's conduct was not based on an intent to harm the plaintiffs, but, rather, a mistaken belief that it was not bound by the financing agreement and a desire to maximize profits stemming from the sale negotiations, and because Dress Barn had been penalized adequately by the $30 million compensatory damage award. Dress Barn and the plaintiffs respectively appealed and cross appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court. See General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts will be set forth as necessary.

In its appeal, Dress Barn claims that there was insufficient evidence to support the jury's verdict and that the trial court improperly: (1) charged the jury on the statute of frauds and damages; (2) modified its decision on postjudgment interest; and (3) sanctioned Dress Barn for a discovery violation by striking certain testimony. In their cross appeal, the plaintiffs claim that the trial court improperly denied their request for prejudgment interest.[13]

---

[13] The plaintiffs also requested, in the event that this court reverses the trial court's judgment, that we consider whether the trial court improperly granted Dress Barn's motion for summary judgment as to the failure to negotiate in good faith claim and its motion for a directed verdict on the promissory estoppel claim.

We begin with the "well established and rigorous" standard for reviewing sufficiency of evidence claims. *Carrol* v. *Allstate Ins. Co.*, 262 Conn. 433, 442, 815 A.2d 119 (2003). "[O]ur review of a trial court's refusal to direct a verdict or to render a judgment notwithstanding the verdict takes place within carefully defined parameters. We must consider the evidence, including reasonable inferences which may be drawn therefrom, in the light most favorable to the parties who were successful at trial . . . giving particular weight to the concurrence of the judgments of the judge and the jury, who saw the witnesses and heard the testimony . . . . The verdict will be set aside and judgment directed only if we find that the jury could not reasonably and legally have reached their conclusion." (Internal quotation marks omitted.) *Presidential Capital Corp.* v. *Reale*, 231 Conn. 500, 506, 652 A.2d 489 (1994).

"We apply this familiar and deferential scope of review, however, in light of the equally familiar principle that the plaintiff[s] must produce sufficient evidence to remove the jury's function of examining inferences and finding facts from the realm of speculation. . . . If the jury, without conjecture, could not have found a required element of the cause of action, it cannot withstand a motion to set aside the verdict." (Citations omitted; internal quotation marks omitted.) *Carrol* v. *Allstate Ins. Co.*, supra, 262 Conn. 442.

I

The linchpin of the plaintiffs' case is their claim that Dress Barn breached its contract to provide financing for Bedford Fair's deferred billing program.[14] Therefore, we begin with Dress Barn's claim that there was insufficient evidence to prove that it had entered into an enforceable oral contract to provide the financing. First,

[14] We underscore that the "contract" at issue throughout this opinion is the agreement to provide financing, not an agreement to purchase Bedford Fair.

Dress Barn contends that the parties had not agreed on most of the essential terms of the contract, including the identity of the lender—Dress Barn or the bank—and how the loan would be secured. Second, Dress Barn contends that the plaintiffs failed to prove that they had met a condition precedent to the contract, namely, approval from the plaintiffs' creditors for Dress Barn to have priority interest in the deferred billing receivables, and failed to prove that they would have been able to perform the contract. Finally, Dress Barn claims that the trial court improperly instructed the jury on the necessary requirements for the plaintiffs to prove that they had satisfied an exception to the statute of frauds, which otherwise would have precluded enforcement of the oral contract.

We begin with the fundamental principles that guide our inquiry. "Under established principles of contract law, an agreement must be definite and certain as to its terms and requirements. *Presidential Capital Corp.* v. *Reale*, [supra, 231 Conn. 506]; 1 Restatement (Second), Contracts § 33, comment (e), p. 94 (1981). . . . [W]here the memorandum appears [to be] no more than a statement of some of the essential features of a proposed contract and not a complete statement of all the essential terms, the plaintiff has failed to prove the existence of an agreement." (Citation omitted; internal quotation marks omitted.) *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, 243 Conn. 832, 843, 708 A.2d 1361 (1998).

The evidence adduced at trial, read in the light most favorable to sustaining the verdict, supports the following additional facts necessary to the resolution of this claim. At the April 4, 1997 meeting, the parties discussed certain terms of the financing. Specifically, under the agreement, Dress Barn would provide $2 to $3 million in financing in the form of a line of credit. Bedford Fair would be entitled to draw an amount equal to 90 percent

of the face value of the deferred billing receivables, after it had drawn fully on its bank line of credit. Dress Barn would make a line of credit available by August 1, 1997, and the loan would expire on December 31, 1997. The interest rate on the loan would mirror Bedford Fair's rate on its bank loan, which was estimated at the prime rate plus or minus 1 percent. The amount financed would be secured by a lien against the deferred billing receivables. Dress Barn would have a priority security interest in these receivables. Bedford Fair would arrange to have the deferred billing receivables subject to the lien transferred from the credit card clearinghouse to a separate subsidiary corporation it would create, which would be controlled by Dress Barn. David Jaffe accepted these terms at the April 4 meeting when he stated that Dress Barn would provide financing and shook hands with Glazer on the deal. In early to mid-April, David Jaffe agreed to a request by Glazer to increase the line of credit to a maximum of $4 million.[15]

In early June, Glazer contacted David Jaffe to let him know that the bank had suggested an alternative financing scheme that would be easier to implement. Instead of Dress Barn loaning the money (scenario 1), the bank would loan the money to Bedford Fair and Dress Barn would guarantee the loan to the bank up to $4 million (scenario 2). David Jaffe's response, according to Glazer's testimony, was, "if it's less paper intensive and we don't need an intercreditor's agreement . . . that's fine, we'll do it that way" and "sure, if it's easier, we're certainly open to that." On June 23, David Jaffe informed Glazer that Dress Barn would not support the deferred financing because Jaffe

---

[15] A conclusion that the parties had reached an agreement on all of the aforementioned terms is supported not only by the testimony of four witnesses for the plaintiffs, all of whom attended the April 4 meeting, but also by two drafts of a "Loan and Security Agreement" written by Dress Barn's counsel dated May 30, 1997, and June 5, 1997.

now perceived risks that he had not been aware of when Dress Barn initially agreed to provide the financing. Jaffe did not expressly indicate whether those risks related to scenario one, scenario two or both; Glazer understood Jaffe's comment as a rejection of both scenarios.

In our view, the jury reasonably could have found on the basis of the aforementioned facts that the parties had agreed on the essential terms of an agreement with respect to scenario one, under which Dress Barn would be the lender. To the extent that Dress Barn contests that the parties had not agreed on the mechanics of how its secured interest in the deferred receivables was to be implemented, we agree with the plaintiffs that these were details of the transactions, not essential terms that would preclude formation of a contract. See *Willow Funding Co., L.P.* v. *Grencom Associates*, 63 Conn. App. 832, 843–44, 779 A.2d 174 (2001) ("[t]he fact that parties engage in further negotiations to clarify the essential terms of their mutual undertakings does not establish the time at which their undertakings ripen into an enforceable agreement"); id., 844 ("[u]nder the modern law of contract, if the parties so intend, they may reach a binding agreement even if some of the terms of that agreement are still indefinite").

We further conclude that, although Glazer's proposal under scenario two was too indefinite as to its essential terms to provide the basis for an enforceable contract,[16]

---

[16] We agree with Dress Barn that scenario two was too indefinite for several reasons. Scenario two was a three party agreement, requiring that Dress Barn execute both a guarantee agreement with the bank under terms mutually agreeable to those two parties, as well as a loan agreement with Bedford Fair for repayment of funds Dress Barn provided to the bank pursuant to the guarantee. With respect to the guarantee agreement, the plaintiffs presented no evidence as to what terms the bank intended to impose on Dress Barn, such as, inter alia, interest rates and terms of payment. There was no evidence that the bank and Dress Barn ultimately agreed on any terms of the guarantee. With respect to the loan agreement with Bedford Fair for repayment of funds, at least one essential term was not agreed on

the parties were bound nonetheless under scenario one. Glazer did not withdraw scenario one expressly when he proposed scenario two as an "alternative." Nor do David Jaffe's comments, both in response to Glazer's proposal and in repudiation of the financing agreement, compel the conclusion that Jaffe construed Glazer's proposal as a withdrawal of the parties' agreement under scenario one. There also was no evidence that would have compelled the jury to conclude that the plaintiffs were unable to proceed under scenario one.[17] Thus, the jury reasonably could have concluded that Glazer would not have withdrawn a certain deal that both parties had agreed to for one that might never come to fruition.

"As in many jury trials, the jury in this case was required to sort out, from evidence that was in considerable conflict, those facts that would form the basis for its verdict. It was for the jury to decide whether there was a binding contractual relationship between the par-

---

by the parties. Although testimony clearly established that Dress Barn insisted that, as a term of the financing agreement, it would have a priority interest in the deferred billing receivables, under scenario two, the bank, not Dress Barn, would have priority interest in this security. There is no evidence that Dress Barn assented to this material change. Accordingly, scenario two was too indefinite to constitute an enforceable contract. See *L & R Realty* v. *Connecticut National Bank*, 53 Conn. App. 524, 537–38, 732 A.2d 181 (concluding that subrogation agreement was unenforceable because parties had not agreed on essential terms), cert. denied, 250 Conn. 901, 734 A.2d 984 (1999).

[17] Roger Feldman, Bedford Fair's counsel, testified that it was his understanding that the bank had agreed to proceed under scenario one, requiring that it waive its negative pledge on the assets at issue. Indeed, the bank's rationale for suggesting the alternative arrangement—it would require fewer documents to be executed and the bank preferred to earn the interest off the loan—does not suggest that it would not make the necessary arrangements to proceed under scenario one, just that it preferred to proceed under scenario two. Although there was testimony that Bedford Fair had negotiated with the bank to obtain the intercreditor agreements required under scenario one and had not yet obtained them by the time Glazer proposed scenario two, there was no testimony that the bank had refused or would refuse to provide those agreements.

ties. . . . The jury's exercise of its fact-finding function included the duty to reconcile evidentiary inconsistencies. If such inconsistencies were to be sufficient to upset jury verdicts, not many would be sustained on appeal." *Pagano* v. *Ippoliti*, 245 Conn. 640, 654, 716 A.2d 848 (1998). We note in this regard that, although Glazer testified that scenario one had "morphed," "evolved," or "changed" into scenario two,[18] the jury could have construed those comments, in light of the other evidence, simply to mean that he expected that the parties would proceed under scenario two if and when Dress Barn and the bank agreed on the terms of the guarantee, as that arrangement was the one preferred by the bank.[19] See *Botticello* v. *Stefanovicz*, 177 Conn. 22, 31, 411 A.2d 16 (1979) ("[a] contract is not too uncertain for specific enforcement merely because a promisor is given a choice of performing in several ways, whether expressed as alternative performances or otherwise").

In light of our conclusion that the terms of scenario one were sufficiently definite and that the parties agreed

---

[18] Glazer testified: "I informed my attorneys how the transaction had evolved from Dress Barn, making the guarantee to Dress Barn—Dress Barn making [the] deferred billing loan to their guaranteeing the loan"; "[o]riginally, I told Dress Barn that it would be easier, less document intensive if we merely changed the deal from their loaning us the money to their guaranteeing a loan which would be provided by the [bank]"; and "I didn't anticipate or reasonably expect that Dress Barn would have a heightened level of risk because it morphed from a direct loan to a guarantee of a loan."

[19] Indeed, when Glazer was asked on redirect examination what he would have done if David Jaffe had indicated that his concerns about the financing risks were limited to scenario two, Glazer responded, "I would have suggested that we return to scenario one where they felt they would be secured. I thought they would be secured under either scenario, but if they felt they would be more secure under scenario one, I would have suggested that, suggested that they reach for the [bank] and we would have reached for the [bank] as well." These comments suggest that Glazer thought that scenario one still was on the table, and perhaps that he would have elicited Dress Barn's assistance in getting the bank to expedite the intercreditor agreements.

to be bound under those terms, we turn to Dress Barn's claim that the plaintiffs' failure to satisfy a condition precedent to the agreement precludes its enforcement. Specifically, Dress Barn claims that a condition precedent to the agreement was that the plaintiffs were to deliver a perfected security interest in the deferred billing receivables by way of intercreditor agreements. Because the plaintiffs did not, and in Dress Barn's view could not, deliver such an interest, Dress Barn claims it cannot be liable for a breach of the financing contract. We disagree.

In the absence of a written agreement or other unequivocal evidence establishing that delivery of intercreditor agreements was a condition precedent to the financing agreement, the jury was not compelled to reach such a conclusion. The jury could have concluded that this requirement was merely a term, perhaps even an essential term, of the contract. See *Christophersen* v. *Blount*, 216 Conn. 509, 512, 582 A.2d 460 (1990) (noting that whether performance of act is condition precedent depends on intent of parties as expressed in instrument and circumstances surrounding execution). Although Mackey's letters to Bedford Fair's principal creditors indicated that intercreditor agreements would be needed, he indicated that Bedford Fair's counsel, not Dress Barn, had advised him that such agreements would be needed. Notably, according to Glazer's notes of the June 23, 1997 conversation in which David Jaffe repudiated Dress Barn's commitment to provide financing, Jaffe did not cite the plaintiffs' inability to meet that condition as a reason for the action. To the contrary, Jaffe indicated that Dress Barn was unwilling to provide the financing even if the commitment had been secured.

We note, however, that, even if the delivery of intercreditor agreements were a condition precedent to the contract, Dress Barn waived its right to interpose that

defense by repudiating the contract before time neces-
sarily would have expired for the plaintiffs to comply
with that condition. See id., 513 (in absence of specific
time limit to satisfy condition precedent, reasonable
time is presumed). Moreover, the jury reasonably could
have concluded that the plaintiffs would have been
able to comply with that condition had Dress Barn not
repudiated the financing agreement. See footnote 17 of
this opinion; see also *McKenna* v. *Woods*, 21 Conn. App.
528, 535, 574 A.2d 836 (1990) (sufficient evidence that
plaintiff would have been able to perform contract to
purchase property when plaintiff had not formally
applied for mortgage, but had discussions with mort-
gage broker and was confident that he could secure
one).

## II

It is undisputed that, because the subject of the oral
contract was a loan well in excess of $50,000, the statute
of frauds[20] would bar its enforcement unless an excep-
tion to the statute applies.[21] Dress Barn first claims that
the trial court improperly instructed the jury on the
exception to the statute of frauds. Specifically, Dress

---

[20] General Statutes § 52-550 (a) provides in relevant part: "No civil action
may be maintained in the following cases unless the agreement, or a memo-
randum of the agreement, is made in writing and signed by the party, or
the agent of the party, to be charged . . . (6) upon any agreement for a
loan in an amount which exceeds fifty thousand dollars."

[21] The statute of frauds issue was brought to the foreground through the
following exchange between Elliott Jaffe and the plaintiffs' counsel on cross-
examination, which both sides later highlighted in their closing arguments:

"Q. If [people] were dealing with [David Jaffe] about a business matter,
you don't think people would be well within their rights to rely on him, is
that what you're saying?

"A. I am saying that, *if it ain't writ, it ain't said*, counselor.

"Q. If it ain't writ, it ain't said. Is that because if something is not written,
you could then deny that it was said, Mr. Jaffe?

"A. No. But you can't count on it as being a legal document unless you
have something in your hand." (Emphasis added.)

Barn contends that the trial court improperly divided
one exception known *either* as the doctrine of part
performance *or* the doctrine of equitable estoppel into
two distinct exceptions—a "part performance" excep-
tion and an "equitable estoppel" exception. Dress Barn
further claims that there was insufficient evidence of
part performance to avoid the statute of frauds. In
response, the plaintiffs contend that the instruction was
an accurate statement of the law[22] and that there was
sufficient evidence of part performance. We conclude
that the jury charge was improper, but that there was
insufficient evidence of part performance to warrant a
new trial.

A

We begin with the jury charge on the statute of frauds
exception. The trial court's instruction to the jury pro-
vided in relevant part: "The plaintiff[s] [rely] on two
exceptions to the statute of frauds. The first exception
is known as the part performance exception. . . . In
order for the part performance exception to apply, two
criteria must be met. First, the acts of part performance
must be of such a character that they can be naturally
and reasonably accounted for in no other way than by
the existence of some contract in relation to the subject
matter in dispute. Second, the [plaintiffs'] part perfor-
mance must have taken place with the continuing

[22] The plaintiffs also contend that we cannot review Dress Barn's claim
regarding the jury charge because it failed to preserve its objection to the
charge. We disagree. "A party may preserve for appeal a claim that a jury
instruction was improper either by submitting a written request to charge
or by taking an exception to the charge as given." *Pestey* v. *Cushman*, 259
Conn. 345, 372–73, 788 A.2d 496 (2002); accord *State* v. *Ramos*, 261 Conn.
156, 169–70, 801 A.2d 788 (2002). Dress Barn submitted a request to charge
on this issue that is consistent with its claim. Additionally, Dress Barn joined
the plaintiffs' blanket exception to the charge. The plaintiffs cannot seek
to preserve their objections to a jury charge by asserting a joint blanket
exception and then use that blanket exception as a basis to preclude review
of Dress Barn's claim. Thus, Dress Barn's claim is preserved.

assent, express or implied, or knowledge of Dress Barn [and] be such as to alter the relations of the parties. The second exception to the statute of frauds is called equitable estoppel. There are, in turn, two elements to the equitable estoppel exception. First, a party, here Dress Barn, must do or say something that is intended or calculated to induce another to believe in the existence of a contract and to act upon that belief. Second, the other party, here the plaintiff[s], [are] influenced thereby, and [change their] position in reasonable reliance or does some other act to [their] injury which [they] otherwise would not have done. If you find that the plaintiff[s] [have] proven either exception to the statute of frauds, then you must find that the statute of frauds does not apply and that the alleged agreement need not be in writing to be enforceable."

In reviewing the foregoing instruction, we "adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts. . . . [T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.*, 267 Conn. 279, 289–90, 838 A.2d 135 (2004).

As an initial matter, we note that our jurisprudence in this area has not been a model of clarity. Thus, we take this opportunity to both clarify and explain the circumstances in which a contract may be enforced despite noncompliance with the statute of frauds.

Equitable estoppel is a doctrine that operates in many contexts to bar a party from asserting a right that it otherwise would have but for its own conduct. See, e.g., *Boyce* v. *Allstate Ins. Co.*, 236 Conn. 375, 377, 673 A.2d 77 (1996) (analyzing equitable estoppel as bar to defendant insurance company's invocation of insurance contract provision); *Berube* v. *Nagle*, 81 Conn. App. 681, 687–88, 841 A.2d 724 (2004) (concluding equitable estoppel barred plaintiffs from claiming right-of-way did not exist over their property); *McNeil* v. *Riccio*, 45 Conn. App. 466, 470–72, 696 A.2d 1050 (1997) (analyzing application of equitable estoppel to statute of limitations defense). In its general application, we have recognized that "[t]here are two essential elements to an estoppel—the party must do or say something that is intended or calculated to induce another to believe in the existence of certain facts and to act upon that belief, and the other party, influenced thereby, must actually change his position or do some act to his injury which he otherwise would not have done." (Internal quotation marks omitted.) *DeLuca* v. *C. W. Blakeslee & Sons, Inc.*, 174 Conn. 535, 544–45, 391 A.2d 170 (1978). This court previously has applied the doctrine of equitable estoppel to bar a party from asserting the statute of frauds as a defense so as to prevent the use of the statute itself from accomplishing a fraud. See, e.g., id.; *First Connecticut Small Business Investment Co.* v. *Arba, Inc.*, 170 Conn. 168, 174, 365 A.2d 100 (1976); *Wolfe* v. *Wallingford Bank & Trust Co.*, 124 Conn. 507, 513–14, 1 A.2d 146 (1938); *Santoro* v. *Mack*, 108 Conn. 683, 690–91, 145 A. 273 (1929).

When estoppel is applied to bar a party from asserting the statute of frauds, however, we also require that the party seeking to avoid the statute must demonstrate acts that constitute "part performance" of the contract. See *Galvin* v. *Simons*, 128 Conn. 616, 619, 25 A.2d 64 (1942) ("[t]he doctrine of part performance as related

to the [s]tatute of [f]rauds is based on estoppel"). Specifically, "[t]he acts of part performance . . . must be such as are done by the party seeking to enforce the contract, in pursuance of the contract, and with the design of carrying the same into execution, and must also be done with the assent, express or implied, or knowledge of the other party, and be such acts as alter the relations of the parties. . . . . The acts also must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute."[23] (Citation omitted; internal quotation marks omitted.) *DeLuca* v. *C. W. Blakeslee & Sons,*

---

[23] Dress Barn's request to charge properly reflected this statement of the applicable law. The proposed request to charge on this issue provided: "The plaintiffs have not introduced any evidence that the alleged agreement for a $4,000,000 loan was in writing and signed by Dress Barn. There is, however, a limited exception to the strict requirements of the [s]tatute of [f]rauds, known as the *doctrine of part performance or estoppel.* This doctrine provides that in those cases where one party, in reliance upon the contract, has partly performed it to such an extent that a repudiation of the contract by the other party would amount to the perpetration of a fraud, equity looks upon the contract as removed from the operation of the statute of frauds. . . .

"To constitute part performance, the acts must be of such a character that they can be reasonably accounted for in no other way than by the existence of some contract in relation to the subject matter in dispute . . . . Stated another way, the acts done in part performance must be of such weight or significance as to compel the inference that there was in fact an agreement by which the acts in question were required of the party performing them and therefore explainable by no other theory but that such agreement did in fact exist. . . . Acts which are merely done in anticipation of an agreement are insufficient to satisfy the [s]tatute of [f]rauds and are therefore distinguishable from acts which are done in pursuance of an agreement. . . .

"In addition to having to compel the inference of an agreement, the acts of part performance must be performed with the assent, express or implied, of knowledge of [Dress Barn]. . . .

"You must also find that the party seeking enforcement, in reasonable reliance on the contract and on the continuing assent of the party against whom enforcement is sought, has so changed his position that injustice can be avoided only by specific enforcement." (Citations omitted; internal quotation marks omitted.)

*Inc.*, supra, 174 Conn. 545. In the context of the statute of frauds, therefore, we sometimes have referred to the application of estoppel as the "doctrine of part performance . . . ."[24] See, e.g., *Rutt* v. *Roche*, 138 Conn. 605, 608, 87 A.2d 805 (1952); *Galvin* v. *Simons*, supra, 619.

Thus, in sum, the elements required for part performance are: (1) statements, acts or omissions that lead a party to act to his detriment in reliance on the contract; (2) knowledge or assent to the party's actions in reliance on the contract; and (3) acts that unmistakably point to the contract. See *Baliles* v. *Cities Services Co.*, 578 S.W.2d 621, 624 (Tenn. 1979) ("[e]quitable estoppel, in the modern sense, arises from the conduct of the party, using that word in its broadest meaning, as including his spoken or written words, his positive acts, and his silence or negative omission to do anything" [internal quotation marks omitted]). Under this test, two separate but related criteria are met that warrant precluding a party from asserting the statute of frauds. *H. Pearce Real Estate Co.* v. *Kaiser*, 176 Conn. 442, 443, 408 A.2d 230 (1979). First, part performance satisfies the evidentiary function of the statute of frauds by providing proof

---

[24] Some of the confusion between the labels we have attached to these doctrines may be explained by the fact that this court previously had held that the doctrine of part performance only may be applied to contracts relating to interests in land. See *Burkle* v. *Superflow Mfg. Co.*, 137 Conn. 488, 497, 78 A.2d 698 (1951) ("The doctrine of part performance applies only to agreements for the sale of real estate or any interest in or concerning it. It does not operate to render enforceable contracts not to be performed within a year."). Since *Burkle*, however, this court has applied part performance outside that context. See *Dunham* v. *Dunham*, 204 Conn. 303, 314, 528 A.2d 1123 (1987) (concluding part performance doctrine had not been satisfied in contract not to be performed in one year), overruled in part on other grounds, *Santopietro* v. *New Haven*, 239 Conn. 207, 213, 682 A.2d 106 (1996); see also *Union Trust Co.* v. *Jackson*, 42 Conn. App. 413, 419, 679 A.2d 421 (1996) (applying doctrine to contract for loan in excess of $50,000). The parties in the present case have not questioned the applicability of the part performance doctrine to this case, nor have they questioned the type or scope of relief available should it apply. See footnote 25 of this opinion.

of the contract itself. Id.; see *Heyman* v. *CBS, Inc.*, 178 Conn. 215, 221, 423 A.2d 887 (1979) ("primary purpose of the statute [of frauds] is to provide reliable evidence of the existence and the terms of the contract"). Second, the inducement of reliance on the oral agreement implicates the equitable principle underlying estoppel because "repudiation of the contract by the other party would amount to the perpetration of a fraud." (Internal quotation marks omitted.) *H. Pearce Real Estate Co.* v. *Kaiser*, supra, 443.

Therefore, although this court on occasion has used the terms interchangeably, we never have intended that the doctrine of equitable estoppel and the doctrine of part performance operate as independent exceptions to the statute of frauds.[25] See *Breen* v. *Phelps*, 186 Conn. 86, 94–95, 439 A.2d 1066 (1982); *Ubysz* v. *DiPietro*, 185 Conn. 47, 54, 440 A.2d 830 (1981); *DeLuca* v. *C. W. Blakeslee & Sons, Inc.*, supra, 174 Conn. 544–45; *Santoro* v. *Mack*, supra, 108 Conn. 690–91. Rather, part performance is an essential element of the estoppel exception to the statute of frauds. See *Wolfe* v. *Wallingford Bank & Trust Co.*, supra, 124 Conn. 513–16 (affirming judgment in favor of plaintiff on contract damages; concluding estoppel barred statute of frauds defense when plaintiff demonstrated both reliance and part performance).

---

[25] In *Wolfe* v. *Wallingford Bank & Trust Co.*, supra, 124 Conn. 513–16, this court differentiated the doctrines on the basis of the type of relief sought—part performance entitled a party to equitable relief and equitable estoppel entitled a party to damages at law. Many, but not all, jurisdictions continue to adhere to this distinction. See 10 S. Williston, Contracts (4th Ed. 1999) § 28:4, pp. 290–94. Indeed, the doctrine of part performance principally has been used to obtain specific performance of land contracts. In our view, however, this distinction is no longer warranted with the merger of actions in law and equity. Notably, in *Wolfe* v. *Wallingford Bank & Trust Co.*, supra, 516, this court recognized that the plaintiff would have been entitled to the same relief under either doctrine and required part performance as a necessary element when applying equitable estoppel.

Indeed, our review of cases since the mid-1800's reveals no instance in which this court has concluded that a party was estopped from asserting the statute of frauds without evidence of part performance.[26] We recognize that some other jurisdictions apply the doctrine of equitable estoppel even in the absence of part

[26] The plaintiffs cite *O'Sullivan* v. *Bergenty*, 214 Conn. 641, 573 A.2d 729 (1990), for the contrary proposition. That case is distinguishable on its facts, however, and consistent with the foregoing legal principles. In *O'Sullivan*, the defendant contended that a written contract was unenforceable as not in accordance with the statute of frauds. Id., 643–47. The trial court determined that the defendant was barred from asserting the defense under the doctrine of equitable estoppel and did not reach a separate claim that the doctrine of part performance applied. Id., 647. In reviewing the trial court's equitable estoppel holding, we determined that the trial court had made extensive factual findings that supported the judgment. Id., 651. Although this court made no express reference to part performance, thus admittedly muddying the water, among those findings we cited were clear evidence of conduct that we have recognized as sufficient to establish part performance of land contracts—improvements to the property plus possession. See id., 649–51; see also *Botticello* v. *Stefanovicz*, supra, 177 Conn. 32 (substantial improvements constitute part performance); *Galvin* v. *Simons*, supra, 128 Conn. 620 (possession, acceptance of rent and alterations and improvements made in premises constituted part performance). It is also notable that there was ample evidence of a contract, thus satisfying the evidentiary function of the statute of frauds—the written agreement and the defendant's admission that he was obligated under the contract for a certain period of time—thereby obviating the need for evidence of a contract through part performance. The Restatement (Second) of Contracts § 139 (2) (c) (1981) indicates that either acts of part performance or clear and convincing evidence of the making and terms of a contract may provide a basis for relief from the statute of frauds. See also *Consolidation Services, Inc.* v. *Keybank National Assn.*, 185 F.3d 817, 820 (7th Cir. 1999) ("admission by the party to be charged that a contract exists can take the place of the signed memorandum ordinarily required to comply with the statute of frauds"). We need not, however, under the facts of this case, decide whether to adopt the Restatement (Second) position and permit evidence of the written agreement in lieu of part performance.

The plaintiffs also rely on *McNeil* v. *Riccio*, supra, 45 Conn. App. 466, for the proposition that there are two separate exceptions to the statute of frauds. In *McNeil*, however, the Appellate Court applied both the part performance and reliance prongs of the estoppel exception in its discussion of the statute of frauds, and then applied the general doctrine of equitable estoppel only in its disposition of a separate issue regarding the statute of *limitations*. Id., 470–72.

performance or when evidence of part performance may be insufficient. See 10 S. Williston, Contracts (4th Ed. 1999) § 27:15, pp. 140–41. In our view, however, this approach is unwise when an independent cause of action or other remedial measures may be available to address such conduct, including negligent misrepresentation, fraud and such. See, e.g., *DeLuca* v. *C. W. Blakeslee & Sons, Inc.*, supra, 174 Conn. 542–47 (analyzing both damages claim for breach of oral contract and fraud claim arising from same contract).

In the present case, the trial court improperly instructed the jury that it could find that an exception to the statute of frauds applied if it found that the plaintiffs had proved *either* part performance of the contract *or* detrimental reliance induced by Dress Barn. The principle defect here is that this instruction permitted the jury to conclude that acts of detrimental reliance other than those that would establish part performance were sufficient. By so doing, the trial court allowed the jury to find Dress Barn liable for breach of contract without necessarily finding the elements of the part performance doctrine evidencing the existence of the contract. Thus, the trial court improperly instructed the jury on the statute of frauds.

B

Having concluded that there was an improper jury instruction, we typically would consider whether the error was harmful and thus whether a new trial is warranted. See *Pagano* v. *Ippoliti*, supra, 245 Conn. 651–52. In this case, however, Dress Barn claims that there is insufficient evidence of part performance. In response, the plaintiffs contend that, consistent with the evidence adduced at trial, they proved part performance. If we were to agree with Dress Barn, then the plaintiffs would not be entitled to a new trial.

Dress Barn notes that the plaintiffs did not engage in any acts that constituted actual performance required under the terms of the contract, such as setting up the separate subsidiary corporation into which the deferred billing receivables were to be segregated or obtaining the intercreditor agreements to perfect Dress Barn's priority interest in the receivables. Dress Barn asserts that the only act that the plaintiffs undertook was the offering of the deferred billing in the fall 1997 catalogs.[27] Because this act can be explained by reasons other than that the plaintiffs had an agreement with Dress Barn to finance that undertaking, Dress Barn contends that this act cannot constitute part performance. Upon review of the evidence, we conclude that there was insufficient evidence of part performance.

This court has rejected the more stringent approach taken by many other jurisdictions that the acts of part performance actually must consist of those bargained for acts constituting the basis of the agreement. See *Cohen* v. *Paine, Webber & Co.*, 113 Conn. 295, 301, 155 A. 71 (1931) (Noting two possible rules of what constitutes part performance of an oral contract sufficient to remove it from the requirements of the statute of frauds: "One of these is that the claimed acts of part

---

[27] The plaintiffs suggest that we should look at the evidence as a whole, rather than individual acts. The only other act we could surmise was evidence of part performance was the plaintiffs' forbearance in seeking other sources of financing. The plaintiffs already were precluded, however, under the terms of the letter of intent, at least as they interpreted it, from pledging their assets to a third party, and thus this act could not have constituted part performance of the financing agreement. See *Unitas* v. *Temple*, 314 Md. 689, 703, 552 A.2d 1285 (1989) ("the part performance itself must furnish evidence of the identity of the contract; and it is not enough that it is evidence of *some* agreement, but it must relate to and be unequivocal evidence of the *particular* agreement" [emphasis in original; internal quotation marks omitted]). We also note that, for the same reasons we reject the offering of the catalogs as acts of part performance, the plaintiffs' forbearance in seeking financing from another source could not have constituted part performance.

performance must be referable to the very contract set up and to no other, while the other is that the acts are sufficient if they are such as to clearly refer to some contract in relation to the matter in dispute, and the terms may then be established by parol. We have adopted and consistently adhered to the second and more liberal rule in numerous decisions in this State."). Although we have adopted a more liberal approach, we nonetheless are mindful of the evidentiary purpose underlying the part performance exception to the statute of frauds. Thus, we have required that the acts of part performance "be such acts as alter the relations of the parties . . . [and] be of such a character that they can be naturally and reasonably accounted for in *no other way* than by the existence of some contract in relation to the subject matter in dispute." (Citation omitted; emphasis added; internal quotation marks omitted.) *DeLuca* v. *C. W. Blakeslee & Sons, Inc.*, supra, 174 Conn. 544–45; see also *Andrews* v. *Babcock*, 63 Conn. 109, 120, 26 A. 715 (1893) (noting, in addition, that acts cannot be "merely preparatory or ancillary to the agreement"). Thus, we have rejected acts offered as evidence of part performance when they do not "compel the inference that there was some contract by which these acts were required of the plaintiff[s] and therefore explainable upon no other theory." *Santoro* v. *Mack*, supra, 108 Conn. 692. "If the acts are reasonably explicable on some other ground . . . they are not sufficient to take the case out of the statute [of frauds]." 73 Am. Jur. 2d 20, Statute of Frauds § 320 (2001).

Although not a completely apt analogy, because almost all of our part performance cases have arisen in the context of contracts relating to interests in land, we look for guidance to the acts that we previously have considered in that context as sufficient acts of part performance. Substantial improvements to the property by the alleged grantee are considered part performance.

See *Botticello* v. *Stefanovicz*, supra, 177 Conn. 32 (substantial improvements); *Galvin* v. *Simons*, supra, 128 Conn. 620 (possession, acceptance of rent and improvements). Also, possession of the property by the alleged grantee is considered part performance when a new entry is effectuated, as compared to merely a continuation of possession, the latter generally considered insufficient proof. *Bradley* v. *Loveday*, 98 Conn. 315, 318, 119 A. 147 (1922) ("[b]etween landlord and tenant, when the tenant is in possession at the date of the agreement, and only continues in possession, it is properly observed that in many cases that continuance amounts to nothing: but admission into possession, having unequivocal reference to a contract, has always been considered an act of part performance" [internal quotation marks omitted]); *Eaton* v. *Whitaker*, 18 Conn. 222, 230–31 (1846) (continued possession not part performance). Continued possession may be sufficient evidence of part performance, however, if combined with improvements that are consistent with a long-term or permanent tenancy. See *Rienzo* v. *Cohen*, 112 Conn. 427, 430–31, 152 A. 394 (1930). Thus, acts that unmistakably point to a contract as the only reasonable explanation for their having been undertaken constitute part performance.[28] See *Greene* v. *Scott*, 3 Conn. App. 34,

[28] Indeed, whereas partial or full payment of the purchase price for the sale of land under an oral contract would constitute actual performance of a term of the contract, this court has held that such conduct "does not take the case out of the statute of frauds. . . . The reason usually given for this rule is that the purchaser normally may have restitution of the consideration paid so that his predicament does not warrant the application of an equitable doctrine designed to prevent the statute of frauds itself from becoming an 'engine of fraud.'" (Citations omitted.) *Breen* v. *Phelps*, supra, 186 Conn. 94–95; see also *Eaton* v. *Whitaker*, supra, 18 Conn. 229 (noting that courts had abandoned position that payment of money was act of part performance because of difficulty in determining what was meant by act and availability of other means of recovering money paid). Consistent with this rationale, this court also long has recognized that recovery may be had for money paid or services performed even in the absence of a contract that complies with the statute of frauds on a theory of implied contract. See *Wolfe* v. *Wallingford Bank & Trust Co.*, 122 Conn. 507, 511, 191 A. 88 (1937).

37, 484 A.2d 474 (1984) (concluding that part performance was demonstrated because it would have been illogical to assume that plaintiff would have paid additional money to defendant to extend contract for sale of land when plaintiff could not obtain financing to complete original contract).

Turning to the case at hand, we consider whether a jury reasonably could conclude that the only reasonable explanation for the plaintiffs having offered the deferred billing in the fall 1997 catalog was that Dress Barn had agreed to finance the undertaking. Weighing against a finding of part performance is undisputed evidence that the plaintiffs offered deferred billing in the four catalogs that preceded the fall 1997 catalog—winter 1996, holiday 1996, spring 1997 and summer 1997—without financing from Dress Barn or any other source. Although the plaintiffs initially offered the deferred billing on a test basis, their financial reports indicate that they offered deferred billing at essentially the same levels in the summer and fall 1997 catalogs. Of particular significance is the fact that, in July, 1997, the plaintiffs offered deferred billing in their winter 1997 catalog, even *after* the plaintiffs knew that Dress Barn was not going to provide financing for the fall catalog.[29] Like a tenant continuing in possession of the property, an act that constitutes a continuing course of conduct does not "compel the inference that there was some contract by which these acts were required of the plaintiff and therefore explainable upon no other theory." *Santoro* v. *Mack*, supra, 108 Conn. 692; see *Andrews* v. *Babcock*, supra, 63 Conn. 121 ("when the

---

[29] Indeed, the fact that the plaintiffs offered the deferred billing in the winter 1997 catalog, at a time when they knew they already were at financial risk, suggests that they might have made a similarly risky decision to offer deferred billing in the fall 1997 catalog without a financing agreement in place. Clearly, there were benefits that accrued to the plaintiffs by offering the deferred billing in that it increased Bedford Fair's sales and its attractiveness to a potential buyer.

possession is not a new fact, but is the continuation of a former similar condition . . . the intent [to carry out and execute the agreement] must be proved by some further act which clearly shows that possession must be accounted for by the new relation, and cannot be referred to the previous holding" [internal quotation marks omitted]); see also *Carl A. Haas Automobile Imports, Inc.* v. *Lola Cars Ltd.*, 933 F. Sup. 1381, 1389–90 (N.D. Ill. 1996) (rejecting as evidence of part performance activity that plaintiff previously engaged in for extensive period of time prior to alleged contract).

The plaintiffs, however, point to evidence demonstrating that Bedford Fair was particularly vulnerable in terms of cash flow problems in July and August of 1997, when they offered the deferred billing. They emphasize testimony by Glazer, Mackey and others that the plaintiffs would not have offered the deferred billing in the fall 1997 catalog unless they secured financing from Dress Barn or a third party. We disagree that this testimony provides competent proof that the acts are "explainable upon no other theory" than that there was a financing contract. *Santoro* v. *Mack*, supra, 108 Conn. 692.

This court previously has explained that, "if we are to give any effect to the Statute of Frauds, it cannot be permitted that a plaintiff may show by parol evidence a verbal agreement . . . and then a part performance by himself of that agreement, and thus alone lay the foundation for specific performance on the part of the defendant. Pomeroy well says of such a proceeding, that it would amount 'to a virtual repeal of the statute.' [J. Pomeroy, Specific Performance of Contracts (2d Ed. 1897) § 108, p. 154.]

"In a situation such as we have under review, there are two entirely distinguishable matters to be established by proof, to wit: (1) that there was some

agreement in pursuance of which the plaintiff has acted in part performance, and (2) what the nature and terms of that agreement were. The doctrine of part performance requires that there be preliminary proof establishing the first fact before the court will accept oral testimony concerning the second inquiry. In other words, it must appear that there must have been some agreement between the parties, upon the strength of which and in pursuance of which the plaintiff has acted in a part performance which would be to his injury if the defendant was not compelled to perform, before evidence in parol will be received to ascertain what the agreement was that by the enforcement of its terms a wrong may not be accomplished. This preliminary evidence generally is that of conduct—conduct of the parties which points unmistakably, as Pomeroy says, to an agreement which cannot, 'in the ordinary course of human conduct, be accounted for in any other manner than as having been done in pursuance of a contract.' [Id.]" *Verzier* v. *Convard*, 75 Conn. 1, 6–7, 52 A. 255 (1902).

Consistent with the foregoing, we have found no cases, nor have the plaintiffs pointed us to any, in which testimonial evidence as to intent, rather than actions, was probative evidence of part performance. Indeed, if we were to accept as dispositive testimony that a party would not have undertaken the action "but for" the other party's promise, this limited exception to the statute of frauds would swallow the rule. Thus, we conclude that the jury could not have concluded reasonably on the evidence presented that the plaintiffs established entitlement to the doctrine of part performance to excuse compliance with the statute of frauds. Such a conclusion is not inconsistent with the jury's verdict in that the charge would have permitted the jury to find that an exception to the statute of frauds had been met without finding part performance. Accordingly, the

plaintiffs failed to prove that they had an enforceable contract for financing.

## III

We next turn to Dress Barn's claim that there was insufficient evidence to establish negligent misrepresentation. The plaintiffs asserted at trial that Dress Barn negligently had misrepresented that it would complete due diligence and finalize documents for the purchase of Bedford Fair by June 30, 1997, and thereafter complete the acquisition by July 28, 1997. The plaintiffs claimed that they relied on these misrepresentations to their detriment by dedicating their resources to completing the transaction and by agreeing to the restriction in the letter of intent that precluded them from negotiating with other parties until after June 30, 1997.

Dress Barn contends that the dates it set forth in the letter of intent cannot provide a basis for negligent misrepresentation as a matter of law because the letter of intent was nonbinding with respect to its obligation to complete the sale and set forth only an "anticipated" date for the completion of due diligence. It further contends that the evidence does not demonstrate that the plaintiffs would have conducted themselves differently in the absence of such representations.[30] We agree with Dress Barn.

"This court has long recognized liability for negligent misrepresentation. We have held that even an innocent misrepresentation of fact may be actionable if the declarant has the means of knowing, ought to know, or

---

[30] Dress Barn also contends that the plaintiffs' failure to disclose the fact that Bedford Fair's loan was "in workout"—meaning that the bank was exercising special oversight of the loan because Bedford Fair periodically had not met its loan conditions—and their failure to produce audited financial statements from Bedford Fair's accounting firm without a " 'going concern' qualification" precluded Dress Barn's adherence to the anticipated deadlines. In light of our conclusion, we need not reach this argument.

has the duty of knowing the truth. . . . The governing principles are set forth in similar terms in § 552 of the Restatement Second of Torts [1977]: One who, in the course of his business, profession or employment . . . supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information." (Internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* 269 Conn. 613, 643, 850 A.2d 145 (2004). Accordingly, an action for negligent misrepresentation requires the plaintiffs in the present case to prove that Dress Barn made a misrepresentation of fact, that Dress Barn knew or should have known that it was false, that the plaintiff reasonably relied upon the misrepresentation, and that the plaintiffs suffered pecuniary harm as a result thereof. See *Citino* v. *Redevelopment Agency,* 51 Conn. App. 262, 273–75, 721 A.2d 1197 (1998); see also *Maturo* v. *Gerard,* 196 Conn. 584, 589, 494 A.2d 1199 (1985).

We begin with the relevant statements in the letter of intent. After setting forth certain terms of the sale in paragraphs one and two, paragraph three of the letter of intent provides in relevant part: "The transaction is expected to close on July 28, 1997 or as soon as practicable thereafter. . . ." Paragraph eight of the letter of intent provides in relevant part: "[Dress Barn] anticipates being able to conduct the necessary 'due diligence' investigation and negotiating and executing definitive agreements by June 30, 1997. . . ." Paragraph twelve provides in relevant part: "This letter is subject to . . . completion of a due diligence review of the business and operations of Bedford Fair [GLZR and BFI], and tax, accounting and other aspects of the Transaction, by [Dress Barn], and [Dress Barn's] satisfaction with the results of such review in its sole discre-

tion . . . ." Paragraph thirteen provides that the letter of intent "does not constitute a binding agreement" with respect to the transactions contemplated therein except as to certain specified provisions, including paragraph eight.[31]

In addition, Glazer testified that David Jaffe made the following statements about closing the sales transaction subsequent to signing the letter of intent. In the June 23, 1997 conversation in which Jaffe informed Glazer that Dress Barn would not provide financing for the deferred billing, Jaffe said that Dress Barn would seek to close as close to July 28 as possible. On July 11, Jaffe stated that "we are still moving with Godspeed." On July 21, Jaffe told Glazer that he was trying to get the deal done as quickly as possible.

We first consider whether Dress Barn knew or should have known that these statements were false at the time they were made.[32] As evidence that Dress Barn

---

[31] The parties qualified their obligation to complete the sales transaction, beyond Dress Barn's satisfaction with the due diligence investigation, by requiring the approval of Dress Barn's board of directors of the transaction and of certain definitive agreements to be negotiated and executed. Paragraph thirteen of the letter of intent further provided: "It is understood that this letter merely constitutes a statement of mutual current intentions with respect to the transactions contemplated herein, does not contain a resolution of all matters upon which agreement must be reached for the consummation of those transactions, and does not constitute a binding agreement with respect thereto. A binding agreement with respect to the Transaction will result only from the execution of the definitive agreements referred to in [paragraph four] above." The plaintiffs concede that Dress Barn was not obligated to complete the acquisition.

[32] Dress Barn questions whether the statements in the letter of intent can be considered statements of fact because it couched them in terms of what it anticipated or expected and because completion of the events were conditioned on its satisfaction with the due diligence investigation. See *Paiva v. Vanech Heights Construction Co.*, 159 Conn. 512, 515, 271 A.2d 69 (1970) (noting general rule that misrepresentation must relate to existing or past fact; when fraud or intentional misrepresentation is alleged, however, "a promise to do an act in the future, when coupled with a present intent not to fulfil the promise, is a false representation"). We have not yet addressed whether statements of judgment or statements conditioned on future events can support a claim for misrepresentation, although many other jurisdictions

should have known that these representations were false, the plaintiffs point to the following evidence: four days after signing the letter of intent, Jaffe told Glazer that Dress Barn's consultant would be unable to complete his report until the first week of July; Dress Barn did not finalize a retention letter for its accounting firm to conduct due diligence until mid-June and did not retain a merchandising consultant until mid-July; Dress Barn provided to the plaintiffs, on July 7, 1997, a draft acquisition letter that was not consistent with the substantive terms of the letter of intent; and Jaffe ultimately gave pretextual reasons for delaying the closing of the deal.

---

have adopted a position against such claims. See, e.g., *Hydro Investors, Inc.* v. *Trafalgar Power, Inc.*, 227 F.3d 8, 20–21 (2d Cir. 2000) (noting that, under New York law, "alleged misrepresentation must be factual in nature and not promissory or relating to future events that might never come to fruition"); *Cook* v. *Little Caesar Enterprises, Inc.*, 210 F.3d 653, 658 (6th Cir. 2000) (noting, under Michigan law, "allegedly false statements must relate to past or existing facts, not to future promises or expectations . . . [or] statements referr[ing] to events which might happen in the future" [citations omitted]); *Rodowicz* v. *Massachusetts Mutual Life Ins. Co.*, 192 F.3d 162, 175 (1st Cir. 1999) (noting that, under Massachusetts law, "statements allegedly relied upon by plaintiffs must be ones of fact, 'not of expectation, estimate, opinion, or judgment' " and " 'false statements of opinion, of conditions to exist in the future, or of matters promissory in nature' " are not actionable in a claim for misrepresentation"); *Razdan* v. *General Motors Corp.*, 979 F. Sup. 755, 759 (N.D. Ill. 1997) (noting that, under Illinois law, "[a] statement which is merely an expression of opinion or which relates to future or contingent events, expectations or probabilities . . . ordinarily does not constitute an actionable misrepresentation," except when promise is device used to commit fraud [internal quotation marks omitted]), aff'd, 2000 U.S. App. LEXIS 21446 (7th Cir. August 18, 2000). This court previously has concluded, however, that an estimate based on professional judgment could provide a basis for misrepresentation. See *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, supra, 269 Conn. 643–44 (concluding that defendant stated counterclaim for misrepresentation when plaintiff either failed to exercise reasonable care or competence in providing estimate of attorney's fees or knowingly provided false estimate). In light of our conclusion that the plaintiffs have failed to prove pecuniary harm resulting directly from the statements at issue, we need not determine exactly how to characterize them.

We conclude that the jury reasonably could have concluded that Dress Barn should have known the statements were false when made. Subsequent conduct may be probative of whether a declarant knew or should have known a statement was false at the time it was made. See *Updike, Kelly & Spellacy, P.C.* v. *Beckett*, supra, 269 Conn. 644 (concluding that evidence that attorney's fees accrued well above estimate shortly after commencing litigation provided reasonable basis to conclude declarant should have known estimate was false when given). In the present case, the jury reasonably could have concluded from Dress Barn's conduct commencing just after signing the letter of intent that it should have known that its statements—that it anticipated completing due diligence and drafting sale documents by June 30, 1997, and that it expected to close the sale by July 28, 1997—were false. In other words, Dress Barn should have known that it would be unable to meet these deadlines.

The evidence also supports the conclusion that the plaintiffs were induced by these statements to expend considerable effort in complying with the due diligence investigation and, more significantly, to forebear from negotiating with third parties regarding selling Bedford Fair or pledging its assets as security for other financing. With respect to whether the plaintiffs reasonably could have relied on the fact that due diligence and draft agreements would be completed by June 30 and that the acquisition would be completed by July 28, Dress Barn's express reservation of its right for due diligence to be completed to its satisfaction, in its own discretion, and not to be bound to complete the acquisition would preclude the plaintiffs from relying on the fact that the parties' intentions necessarily would come to fruition.[33]

[33] It is important in this context to recognize the meaning generally ascribed to a letter of intent. "Generally, letter of intent refers to a writing documenting the preliminary understandings of parties who intend in the future to enter into a contract. . . . [T]he purpose and function of a preliminary letter of intent is not to bind the parties to their ultimate contractual

On the other hand, the plaintiffs justifiably could have relied on Dress Barn's implicit commitment that it would use its best efforts to complete due diligence by June 30. As the parties expressly agreed in the letter of intent that the due diligence and no shop provisions were binding on each of them, a duty of good faith and fair dealing would attach. See *Jaffe* v. *Paramount*, 222 App. Div. 2d 17, 22–23, 644 N.Y.S.2d 43 (1996) ("[i]mplied in every contract is a covenant of good faith and fair dealing").

In the end, however, the plaintiffs cannot prevail on this claim because they have failed to prove that they

objective. Instead, it is only to provide the initial framework from which the parties might later negotiate a final . . . agreement, if the deal works out. . . . [C]alling a document [a] letter of intent implies, unless circumstances suggest otherwise, that the parties intended it to be a nonbinding expression in contemplation of a future contract, as opposed to its being a binding contract.

"Commonly a letter of intent is used so that people negotiating toward an agreement, who do not yet have one, can get their preliminary inclinations down on paper without committing themselves. This avoids a misunderstanding that a commitment has been made. It also has value in preserving a common understanding of what has been talked about in earlier negotiations, before spending the time and money on later negotiations, and justifies further expenditures on attorneys and others. . . .

"All these purposes are defeated if what was meant to be a nonbinding letter of intent is allowed to form the basis for a damages award. Letting a nonbinding letter of intent go to a jury as a possible basis for compensatory and perhaps punitive damages makes it too risky to sign one, so negotiators are deprived of this useful intermediate device between vague feelers and a binding contract. This is not to say that a letter of intent cannot be a contract. Regardless of the title, if the content shows that the parties intended to be bound, and the other requisites of a contract have been satisfied, it may be a contract." (Citations omitted; internal quotation marks omitted.) *Rennick* v. *O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir.), cert. denied, 519 U.S. 865, 117 S. Ct. 174, 136 L. Ed. 2d 115 (1996); see *DSE, Inc.* v. *United States*, 169 F.3d 21, 29 (D.C. Cir. 1999) (letter of intent not binding when completion of due diligence was contingency, among other conditions to be met, and letter expressly stated that parties were not bound); *Rennick* v. *O.P.T.I.O.N. Care, Inc.*, supra, 315–16 (letter of intent not binding when it expressly so stated and future agreement required approval of board of directors).

suffered loss as a result of these misrepresentations, rather than as a result of the loss of financing. See *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* supra, 269 Conn. 643 (negligent misrepresentation requires evidence of pecuniary loss *caused by justifiable reliance upon information at issue*). There are two possible sources from which the plaintiffs' bankruptcy may have resulted—Dress Barn's failure to go through with the acquisition and Dress Barn's failure to provide financing for the deferred billing. As we previously have indicated, the plaintiffs could not have relied justifiably on Dress Barn's representations regarding the acquisition, as they were nonbinding. Although Dress Barn may have failed to make its best effort to complete due diligence by June 30, 1997, perhaps even intentionally, there is no evidence that the plaintiffs had, or otherwise could have obtained, another suitor for Bedford Fair if Dress Barn had determined by June 30 that it would not go forward with the acquisition. Similarly, there is no evidence that, but for Dress Barn's failure to complete due diligence by June 30, the plaintiffs would have obtained financing from another source for the deferred billing. Indeed, from the time Dress Barn first gave its commitment to provide the deferred billing financing on April 4, 1997, well before the plaintiffs signed the letter of intent, until Dress Barn repudiated its commitment to provide financing for the deferred billing on June 23, the plaintiffs were relying on Dress Barn's representations that it would provide the financing. The plaintiffs do not challenge the trial court's ruling directing a verdict for Dress Barn on their claim of negligent misrepresentation as to Dress Barn's statements that it would provide financing; therefore, those representations cannot provide the causal connection to the pecuniary harm supporting this claim. See *Lipshie* v. *George M. Taylor & Son, Inc.,* 265 Conn. 173, 181–83, 828 A.2d 110 (2003) (explaining essential element of causation in

misrepresentation claim; concluding that claim failed because misrepresentation was not cause of harm); see also *Robichaud* v. *Hewlett Packard Co.*, 82 Conn. App. 848, 854, 848 A.2d 495 (2004) (no liability for alleged misrepresentation by defendant because plaintiffs were influenced by other factors in making decision). Although the plaintiffs waited from June 23 until July 1 to look for another source of financing in reliance on Dress Barn's representations that it was working to complete the sale and on the binding no shop provision in the letter of intent, which expired by its own terms on June 30, there is no evidence that they would have secured timely financing from another source had they not relied on Dress Barn's representations for the week between June 23 and July 1. See footnote 9 of this opinion. Therefore, we conclude that there was insufficient evidence of negligent misrepresentation.

## IV

Dress Barn next challenges the sufficiency of the evidence on the plaintiffs' two CUTPA claims—count one, which was predicated on the negotiations and the circumstances surrounding the repudiation, and count four, which was predicated on the actual breach of contract. The plaintiffs claimed at trial that Dress Barn engaged in an unfair trade practice by inducing them to believe that Dress Barn either would provide financing for the deferred billing or would close the acquisition. They further claim that Dress Barn's breach of the financing agreement, in conjunction with Dress Barn's intentional delay in conducting due diligence, allowed Dress Barn to demand unreasonable concessions regarding the acquisition, which led to Bedford Fair's inability to pay its vendors and, ultimately, its filing for bankruptcy.

Dress Barn contends that its conduct did not constitute an unfair and deceptive trade practice because it

did not violate any binding obligations, and there is no evidence of an intent to deceive with regard to its conduct related to the due diligence investigation or the financing agreement. Dress Barn further contends that the plaintiffs were the ones to engage in culpable conduct in that they delayed providing necessary due diligence information and deceived Dress Barn by deliberately withholding information about Bedford Fair's poor financial condition. See footnote 30 of this opinion. Finally, Dress Barn contends that the plaintiffs cannot prove an ascertainable loss independent of the unenforceable financing agreement.

We begin by noting that our review of the plaintiffs' CUTPA claims is constrained by virtue of two factors. First, the trial court instructed the jury, and the plaintiffs have conceded in their briefs to this court, that liability on count four is dependent on Dress Barn's liability on count five, the breach of contract claim. In light of our conclusion that there was insufficient evidence of part performance to overcome the statute of frauds in count five, our review, therefore, is restricted to count one. Thus, we note that, although there is some authority for the proposition that a tort claim based on a contract may be asserted when the contract is otherwise valid but unenforceable for failure to comply with the statute of frauds, the plaintiffs have not asserted such a claim. Compare 10 S. Williston, supra, §§ 27:3 and 27:5 (discussing distinction between enforceability and validity with respect to contract that does not comply with statute of frauds and effects of unenforceability) with *Alan E. Silver, P.C.* v. *Jacobs*, 43 Conn. App. 184, 188–91, 193–94, 682 A.2d 551 (concluding that CUTPA claim could not be stated for lack of ascertainable loss element of such claim when based on breach of oral contingency fee agreement that was unenforceable because it was not in writing as required by statute), cert. denied, 239 Conn. 938, 684 A.2d 708 (1996), overruled in part

on other grounds, *Gagne* v. *Vaccaro*, 255 Conn. 390, 766 A.2d 416 (2001). We limit our consideration of the plaintiffs' CUTPA claim, therefore, to the extent that it does not depend on an enforceable financing contract. In other words, we examine the plaintiffs' CUTPA claim with an eye to the *circumstances* surrounding the repudiation, not the repudiation itself.

Second, our review is constrained by the fact that the trial court directed a verdict in Dress Barn's favor on the plaintiffs' negligent misrepresentation claim with respect to Dress Barn's assurances that it would provide financing for the deferred billing. The trial court concluded that such promises could not provide a basis for misrepresentation in the absence of fraud, which the plaintiffs had not alleged. Because the plaintiffs do not contest that ruling on appeal, we review the plaintiffs' CUTPA claim without considering whether Dress Barn intentionally stated that it would provide the financing, knowing that it did not intend to do so. See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 41, 717 A.2d 77 (1998) ("[b]ecause the wilful and wanton misrepresentation count was charged out of the case, the only remaining bases for the CUTPA allegation are acts amounting to fraudulent concealment and fraudulent misrepresentation"). Indeed, the plaintiffs' theory at trial and in this court appears to be that, although Dress Barn initially intended to provide the financing, it changed its mind in early June, before the catalogs were printed and mailed, when it estimated that the acquisition of Bedford Fair would cost more than its original projection and determined that it could exert leverage on the purchase negotiations by withdrawing its commitment to provide financing. We conclude that the plaintiffs have failed to prove a CUTPA violation under these facts.

We begin with the pertinent law. "[General Statutes § ] 42-110b (a) provides: No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. In determining whether certain acts constitute a violation of this act, we have adopted the criteria set out in the cigarette rule by the federal trade commission . . . (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other business persons]."[34] (Internal quotation marks omitted.) *Williams Ford, Inc.* v. *Hartford Courant Co.*, 232 Conn. 559, 591, 657 A.2d 212 (1995). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public

---

[34] Although we consistently have followed the cigarette rule in CUTPA cases, we also note that, when interpreting "unfairness" under CUTPA, our decisions are to be guided by the interpretations of the Federal Trade Act by the Federal Trade Commission and the federal courts. See General Statutes § 42-110b (c). Review of those authorities indicates that a serious question exists as to whether the cigarette rule remains the guiding rule utilized under federal law. See *American Financial Services Assn.* v. *Federal Trade Commission*, 767 F.2d 957, 969–70 (D.C. Cir. 1985), cert. denied, 475 U.S. 1011, 106 S. Ct. 1185, 89 L. Ed. 2d 301 (1986); see also P. Sobel, "Unfair Acts or Practices Under CUTPA," 77 Conn. B.J. 105 (2003). Because, in the present case, neither party has raised or briefed this issue, and both have briefed the issue applying the cigarette rule, we decline to address the issue of the viability of the cigarette rule until it squarely has been presented to us. See *American Car Rental, Inc.* v. *Commissioner of Consumer Protection*, 273 Conn. 296, 305 n.6, 869 A.2d 1198 (2005).

policy." (Citations omitted; internal quotation marks omitted.) *Cheshire Mortgage Service, Inc.* v. *Montes*, 223 Conn. 80, 106, 612 A.2d 1130 (1992).

The trial court concluded that the plaintiffs were not entitled to an instruction on the first criterion as a matter of law. We therefore consider whether there was sufficient evidence for the jury to find that Dress Barn's conduct was immoral, unethical, oppressive, or unscrupulous and that, as a result, the plaintiffs suffered substantial injury.[35]

We begin by noting that the plaintiffs understandably have focused on Dress Barn's breach of the financing agreement as that is the essential causal link to Bedford Fair's bankruptcy and the $30 million compensatory damages awarded by the jury. Indeed, as we previously have explained in addressing the plaintiffs' negligent misrepresentation claim, Dress Barn's conduct related to due diligence, even if it intentionally delayed those efforts in violation of its duty of good faith and fair dealing, did not cause Bedford Fair's bankruptcy. It is clear that Dress Barn retained the right, under the letter of intent, to complete due diligence to its satisfaction, in its sole discretion. It further expressly retained the right not to proceed with the acquisition. Thus, "[a]lthough the plaintiffs hoped and even expected that [Dress Barn] would [complete the acquisition], [Dress Barn] was under no statutory or contractual obligation

---

[35] Dress Barn contends that, because the plaintiffs could have avoided any harm by not mailing the deferred billing catalogs when they did not have a written financing agreement in hand, they cannot satisfy the third CUTPA criterion of substantial harm. See *Williams Ford, Inc.* v. *Hartford Courant Co.*, supra, 232 Conn. 592 (In order for an injury to be legally unfair, "the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that [the injured parties] themselves could not reasonably have avoided." [Internal quotation marks omitted.]). In light of our conclusion that the plaintiffs have not satisfied the second CUTPA criterion, we need not address this claim.

to do so. Under those circumstances, [Dress Barn] did not violate CUTPA by declining to do that which it simply was not required to do. The analysis does not differ because the plaintiffs, effectively, gambled on an expectation that [Dress Barn] would choose to proceed differently than it did and, subsequently, lost that gamble." *Downes-Patterson Corp.* v. *First National Supermarkets, Inc.*, 64 Conn. App. 417, 428, 780 A.2d 967, cert. granted, 258 Conn. 917, 782 A.2d 1242 (2001) (appeal dismissed June 25, 2002).

With respect to the financing agreement, although Dress Barn cannot be held liable simply for repudiating an unenforceable agreement, CUTPA's reach extends beyond those acts prescribed under the common law. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 43 ("CUTPA reflects a public policy that favors remedying wrongs that may not be actionable under other bodies of law"). We consider, therefore, whether Dress Barn engaged in a deceptive practice prohibited under CUTPA by intentionally failing to disclose until after the catalogs were printed and mailed that it did not intend to provide the financing.

"We have held that [a] failure to disclose can be deceptive only if, in light of all the circumstances, there is a duty to disclose." (Internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, 261 Conn. 620, 635–36, 804 A.2d 180 (2002). Whether such a duty exists presents a question of law. See *Biller Associates* v. *Peterken*, 269 Conn. 716, 721, 849 A.2d 847 (2004). "Regarding the duty to disclose, the general rule is that . . . silence . . . cannot give rise to an action . . . to set aside the transaction as fraudulent. Certainly this is true as to all facts which are open to discovery upon reasonable inquiry. . . . A duty to disclose will be imposed, however, on a party insofar as he voluntarily makes disclosure. A party who

assumes to speak must make a full and fair disclosure as to the matters about which he assumes to speak." (Citation omitted; internal quotation marks omitted.) *Macomber* v. *Travelers Property & Casualty Corp.*, supra, 636; accord *Hinchliffe* v. *American Motors Corp.*, 184 Conn. 607, 612, 440 A.2d 810 (1981) (concluding that there was no CUTPA liability for defendants' failure to disclose that certain Jeep parts were not manufactured by American Motors; "nothing in the record before us suggests that the defendants either affirmatively misrepresented or had a duty to disclose the specific manufacturing history of the component parts"), on appeal after remand, 192 Conn. 252, 470 A.2d 1216 (1984).

A duty to disclose may be imposed by statute or regulation; see *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 44; or such a duty may arise under common law. *Southington Savings Bank* v. *Rodgers*, 40 Conn. App. 23, 29, 668 A.2d 733 (1995), cert. denied, 236 Conn. 908, 670 A.2d 1307 (1996). In the present case, there is no statutory, regulatory or contractual duty that may be imposed. Although the letter of intent imposed certain binding obligations on Dress Barn—not to disclose confidential information, not to negotiate with third parties and to use its best efforts to complete its due diligence investigation by June 30—none of these obligations give rise to a duty to repudiate timely its commitment to provide financing for the deferred billing.[36] Moreover,

---

[36] At trial, the plaintiffs asserted a claim independent of their CUTPA claim that Dress Barn had breached its duty to negotiate the acquisition in good faith, predicated on the letter of intent. Although on appeal the plaintiffs challenge the summary judgment rendered in Dress Barn's favor on the duty to negotiate claim, they never have asserted that this duty gives rise to duties under CUTPA. In light of the plaintiffs' failure to raise this argument, as it relates to CUTPA, and our conclusion that they inadequately briefed their claim that the trial court improperly granted summary judgment on the duty to negotiate claim, we do not consider whether, if Dress Barn had a duty to negotiate an acquisition agreement in good faith under New York law, that duty would have given rise to the duty to disclose timely that it

there is no special relationship here that would give rise to a fiduciary duty. See *Sherwood* v. *Danbury Hospital*, 252 Conn. 193, 203, 746 A.2d 730 (2000) (discussing continuing duty after cessation of act or omission relied upon when there is evidence of either special relationship between parties giving rise to continuing duty or later wrongful conduct by defendant related to prior act). Indeed, the plaintiffs have operated a multimillion dollar business for many years and were represented by counsel throughout their relationship with Dress Barn. The plaintiffs have not cited to any other source from which we could impute a duty. Accordingly, we conclude that Dress Barn's failure to notify the plaintiffs until June 23, 1997, that it had decided not to provide the financing did not constitute a CUTPA violation.

V

In light of these conclusions, we need not consider Dress Barn's remaining claims or the plaintiffs' claim, asserted in their cross appeal, regarding the denial of prejudgment interest. Because we are reversing the judgment of the trial court, however, we turn to the plaintiffs' claim that the trial court improperly granted Dress Barn's motion for a directed verdict on their promissory estoppel claim.[37] See footnote 13 of this opinion.

did not intend to provide financing for the deferred billing. See *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 355, 358, 805 A.2d 735 (rejecting defendant's argument that conduct consisting of unjustified failure to enter into contract can never be conduct that causes losses that are cognizable under CUTPA; noting that defendant had duty to enter into contract), cert. denied, 262 Conn. 922, 812 A.2d 864 (2002).

[37] The plaintiffs also claim that the trial court improperly rendered summary judgment on their claim that Dress Barn failed to negotiate in good faith to complete the sales transaction in accordance with the letter of intent. Dress Barn does not address the merits of either this claim or the plaintiffs' promissory estoppel claim, but instead contends that we should not review either claim because the plaintiffs abandoned them by raising them only in a footnote in their brief. We eschew such a formal distinction when a party adequately has briefed an issue. See *State* v. *Johnson*, 253

The plaintiffs' promissory estoppel claim was predicated on their allegation that Dress Barn "made a clear

Conn. 1, 35 n.34, 751 A.2d 298 (2000) (addressing, but rejecting, claim set forth in footnote in defendant's brief); see also *State* v. *Tatum*, 219 Conn. 721, 742, 595 A.2d 322 (1991) (declining to consider unspecified claims of error "vaguely alluded to" in footnotes; "[c]laimed errors not adequately briefed and not fully developed will not be considered by this court"); *State* v. *Bruno*, 236 Conn. 514, 546 n.22, 673 A.2d 1117 (1996) (declining to address claim in footnote that was "devoid of analysis and of citation to any relevant [legal] authority"). The plaintiffs adequately have set forth the factual and legal basis for their promissory estoppel claim and have cited legal authority in support thereof. Therefore, we do not deem that claim abandoned.

We agree, however, that the plaintiffs have failed to brief adequately their claim that the trial court improperly rendered summary judgment on their claim that Dress Barn violated its duty to negotiate in good faith under New York law. The plaintiffs state in a single sentence the broad proposition that, under New York law, such a duty may arise even if a preliminary agreement does not bind the parties to enter into a final agreement. In support of this statement, the plaintiffs cite one case, *Goodstein Construction Corp.* v. *New York*, 111 App. Div. 2d 49, 489 N.Y.S.2d 175 (1985), aff'd, 67 N.Y.2d 990, 494 N.E.2d 99, 502 N.Y.S.2d 994 (1986). The statement by the plaintiffs is not an entirely correct statement of the law, and the case they cite does not stand for the proposition for which it is offered. Although a duty to negotiate may arise under New York law with respect to a preliminary agreement, it must be found to be a *"binding"* preliminary agreement, not merely an unenforceable agreement to agree. See *Spencer Trask Software & Information Systems, L.L.C.* v. *Rpost International, Ltd.*, United States District Court, Docket No. 02CV1276, 2003 WL 169801 (S.D.N.Y. January 24, 2003); *Teachers Ins. & Annuity Assn. of America* v. *Tribune Co.*, 670 F. Sup. 491, 496–503 (S.D.N.Y. 1987). The plaintiffs do not address why the trial court's conclusion was improper that, in this case, "the letter [of intent] nowhere obligates the parties either to enter into an acquisition agreement *or even to negotiate an acquisition agreement,*" (emphasis added) and they do not cite or apply the multipart test prescribed under New York law to determine whether a preliminary agreement is binding. See *Spencer Trask Software & Information Systems, LLC* v. *Rpost International, Ltd.*, supra (citing as factors to be considered as evidence of intent to be bound: language of agreement, context of negotiations, existence of open terms, any partial performance and necessity of putting agreement into final form, according to custom of similar transactions); *Teachers Ins. & Annuity Assn. of America* v. *Tribune Co.*, supra, 496–503 (seminal case setting forth relevant considerations in determining whether preliminary agreement is binding). In *Goodstein Construction Corp.* v. *New York*, supra, 176, the plaintiff had asserted claims for breach of contract and breach of the duty of good faith and fair dealing, not the duty to negotiate in good faith, and the only tentative agreement at issue was one set forth in an *enforceable contract*. See also *Rooney* v. *Slomowitz*, 11 App. Div. 3d 864, 867, 784 N.Y.S.2d 189 (2004) (rejecting claim for breach of duty of good faith and fair dealing in absence

and definite promise that it would finance [Bedford Fair's] receivables up to a maximum of $4 million . . . ." The trial court granted Dress Barn's motion for a directed verdict on this count because it concluded that the plaintiffs' promissory estoppel claim would rise or fall depending on whether they prevailed on their breach of contract claim. The court reasoned that promissory estoppel is a contract substitute in the absence of consideration, and Dress Barn's failure to contest that contract element would preclude the jury from finding that there was no consideration.

We conclude that the trial court improperly granted the motion for a directed verdict on the plaintiffs' promissory estoppel claim, but that the impropriety was harmless. Promissory estoppel is asserted when there is an absence of consideration to support a contract. See *Torringford Farms Assn., Inc.* v. *Torrington*, 75 Conn. App. 570, 576, 816 A.2d 736 ("[t]he doctrine of promissory estoppel serves as an alternative basis to enforce a contract in the absence of competing common-law considerations"), cert. denied, 263 Conn. 924, 823 A.2d 1217 (2003), citing *D'Ulisse-Cupo* v. *Board of Directors of Notre Dame High School*, 202 Conn. 206, 213, 520 A.2d 217 (1987); see also *Stewart* v. *Cendant Mobility Services Corp.*, 267 Conn. 96, 110, 837 A.2d 736 (2003) (concluding that jury reasonably could find that there was no offer for purposes of breach of contract claim but that there was promise for purposes of plaintiff's promissory estoppel claim). We have permitted a jury to consider in the alternative claims for breach of contract and for promissory estoppel when there is

of enforceable contract). In the absence of any effort by the plaintiffs to cite relevant legal authority or to explain why the letter of intent satisfies this standard, we do not address the claim. See *Ward* v. *Greene*, 267 Conn. 539, 546, 839 A.2d 1259 (2004); *West Haven* v. *Norback*, 263 Conn. 155, 177, 819 A.2d 235 (2003); *Abington Ltd. Partnership* v. *Heublein*, 257 Conn. 570, 586–87 n.29, 778 A.2d 885 (2001); see also footnote 33 of this opinion (explaining meaning generally ascribed to letter of intent).

an issue of whether the agreement may be too indefinite to allow for contract formation. See *Suffield Development Associates Ltd. Partnership* v. *Society for Savings*, supra, 243 Conn. 846 (reversing judgment in favor of plaintiff on breach of contract claim on ground that loan amount was indefinite, but remanding for new trial on promissory estoppel claim when jury originally considered claims in alternative and entered verdict on contract claim only); see also *Benedetto* v. *Wanat*, 79 Conn. App. 139, 151–52, 829 A.2d 901 (2003) (concluding oral agreement was enforceable under either doctrine of promissory estoppel or as supported by consideration).

In the present case, Dress Barn was contesting whether the financing agreement was sufficiently definite to form a contract. Thus, the jury should have been allowed to consider promissory estoppel as an alternative to the breach of contract claim. See *Southington* v. *Commercial Union Ins. Co.*, 254 Conn. 348, 355–56, 757 A.2d 549 (2000). The jury necessarily must have found, however, that the parties had agreed on all the essential terms to allow for contract formation, and we have determined that the evidence reasonably supported that conclusion. Accordingly, the jury could not have found, consistent with its verdict on the breach of contract claim, that the plaintiffs also were entitled to prevail on their promissory estoppel claim.[38]

---

[38] Even if the jury properly could have found for the plaintiffs on both their breach of contract claim and their promissory estoppel claim, such a conclusion would give rise to a possible conflict with the statute of frauds if the promise otherwise would have been required to be in writing. Compare *Torringford Farms Assn., Inc.* v. *Torrington*, supra, 75 Conn. App. 570 (applying statute of limitations applicable to breach of contract to promissory estoppel claim predicated on breach of contract). This court previously has not addressed whether promises that otherwise would be subject to the requirements of the statute of frauds may be enforced on promissory estoppel grounds in the absence of compliance with the statute of frauds; see 1 Restatement (Second), supra, § 139; or whether a separate promise to put the agreement in writing may provide a basis to avoid the statute of frauds. See 10 S. Williston, supra, § 27:14, pp. 128–33; annot., 56 A.L.R.3d

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion NORCOTT, VERTEFEUILLE and ZARELLA, Js., concurred.

PALMER, J., concurring. I agree with and join the majority opinion except insofar as the majority concludes therein that the plaintiffs[1] failed to brief adequately their contention that the trial court improperly had rendered judgment for the defendant, Dress Barn, Inc. (Dress Barn), on the plaintiffs' claim that Dress Barn had violated its duty to negotiate in good faith under New York law. See footnote 37 of the majority opinion. Although the plaintiffs did not extensively brief that claim, I believe that it is adequate for our review.[2]

---

1057 (1974 and Sup. 2004). Because neither party has raised or briefed these issues, however, we decline to address them in the present case.

[1] The plaintiffs include Alan M. Glazer, GLZR Acquisition Corporation and BFI Liquidating Limited.

[2] In particular, I do not agree with the majority that the plaintiffs inadequately briefed that claim merely because they failed to cite or to apply in their brief the multipart test prescribed under New York law for determining whether a preliminary agreement is legally binding. That test is not necessarily implicated when, as in the present case, the parties' preliminary agreement expressly provides that it is binding on the parties. See, e.g., *Arcadian Phosphates, Inc.* v. *Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (when parties expressly agree to be bound by terms of preliminary agreement, court need look no farther than language of agreement). In the present case, the plaintiffs rely on paragraph eight of the parties' letter of intent in support of their claim of a binding agreement. That letter provides in relevant part: "It is understood that this letter merely constitutes a statement of mutual current intentions with respect to the transactions contemplated herein, does not contain a resolution of all matters upon which agreement must be reached for the consummation of those transactions, and does not constitute a binding agreement with respect thereto. A binding agreement with respect to the [t]ransaction will result only from the execution of the definitive agreements referred to in Section 4 [of this letter]. *Notwithstanding the two preceding sentences, upon execution and delivery of this letter by both parties, Sections 5, 6, 8, 9, 10 and 11 of this letter shall be legally binding upon and enforceable against the parties. . . .*" (Emphasis added.)

Upon consideration of the merits of the claim, however, I agree with the trial court that Dress Barn was entitled to judgment as a matter of law on that claim.

The plaintiffs' claim of a breach of the duty to negotiate in good faith is predicated primarily on paragraph eight of the parties' letter of intent, which provides: "[Dress Barn] anticipates being able to conduct the necessary 'due diligence' investigation and negotiating and executing definitive agreements by June 30, 1997. During this period, Bedford Fair [Industries (Bedford Fair)] shall provide [Dress Barn] and its accounting, legal and other representatives, with reasonable access to Bedford Fair's and the [c]ompanies' books and records, and other information regarding their business and their properties, facilities, accountants and management level employees." In granting Dress Barn's motion for summary judgment on the plaintiffs' claim that Dress Barn had violated the duty to negotiate in good faith, the trial court concluded that "[t]his paragraph reveals that the parties anticipated that [Dress Barn] would negotiate, but it does not obligate [Dress Barn] to do so." The trial court further concluded that the only provisions of the letter of intent, including paragraph eight, that were legally binding on the parties, "deal primarily with obligations imposed on the plaintiffs to cooperate with [Dress Barn] during the latter's due diligence investigation of the former, and do not address the claimed duty to negotiate an acquisition agreement. In fact, the letter nowhere obligates the parties either to enter an acquisition agreement or even to negotiate an acquisition agreement."

I agree generally with the trial court's analysis of paragraph eight of the letter of intent. I note further that the first sentence of paragraph eight—the language relied on by the plaintiffs in support of their claim of a breach of the duty to negotiate in good faith—merely was prefatory language to the only duty actually

imposed under the paragraph, namely, the duty of the *plaintiffs* to provide Dress Barn and its representatives with reasonable access to the plaintiffs' books and records so that Dress Barn could conduct its due diligence investigation. Nothing in paragraph eight of the letter of intent suggests the existence of any binding agreement to negotiate, and no such agreement may be found elsewhere in the letter of intent. I therefore would affirm the trial court's judgment in favor of Dress Barn with respect to the plaintiffs' claim alleging a violation of the duty to negotiate in good faith.