******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ARTIE'S AUTO BODY, INC., ET
AL. *v.* THE HARTFORD FIRE
INSURANCE COMPANY
(SC 19219)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald,
Espinosa and Robinson, Js.

*Argued January 13—officially released July 21, 2015*

*Jonathan M. Freiman*, with whom were *Aaron S. Bayer* and *Benjamin M. Daniels*, and, on the brief, *Robert M. Langer* and *Carolina D. Ventura*, for the appellant (defendant).

*David A. Slossberg*, with whom were *David L. Belt* and, on the brief, *Nicole H. Najam, Alan Neigher* and *Ronald J. Aranoff*, pro hac vice, for the appellees (plaintiffs).

*George Jepsen*, attorney general, *Gregory T. D'Auria*, solicitor general, and *Jane R. Rosenberg, Phillip Rosario, Brendan T. Flynn* and *Jonathan J. Blake*, assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

*Michael D. Shumsky* filed a brief for Timothy J. Muris and J. Howard Beales as amici curiae.

*Opinion*

PALMER, J. The plaintiffs, Artie's Auto Body, Inc., A & R Body Specialty, Skrip's Auto Body, and the Auto Body Association of Connecticut (association),[1] brought this class action against the defendant, The Hartford Fire Insurance Company, on behalf of more than 1000 independent automobile (auto) body repair shops in Connecticut. They principally claimed that the defendant had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., by requiring its staff motor vehicle physical damage appraisers (appraisers), who must be licensed in accordance with General Statutes § 38a-790 (a),[2] to use the hourly labor rates agreed on by the defendant and the plaintiff auto body shops, instead of rates that more accurately reflect the actual value of those services, when appraising auto body damage sustained by the defendant's insureds. According to the plaintiffs, the defendant's conduct constituted an unfair trade practice because it offended the public policy found in § 38a-790-8 of the Regulations of Connecticut State Agencies,[3] which requires appraisers to "approach the appraisal of damaged property without prejudice against, or favoritism toward, any party involved in order to make fair and impartial appraisals . . . ." Regs., Conn. State Agencies § 38a-790-8 (2). Following a trial, the jury found in favor of the plaintiffs and awarded them $14,765,556.27 in compensatory damages.[4] Thereafter, the trial court awarded the plaintiffs $20,000,000 in punitive damages and rendered judgment for the plaintiffs in the total amount of $34,765,556.27. On appeal,[5] the defendant claims, inter alia, that the trial court improperly denied its motion for a directed verdict and its motion to set aside the verdict and for judgment notwithstanding the verdict because § 38a-790-8 does not prohibit the insurance practices at issue in this case. We agree and, accordingly, reverse the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. The plaintiffs commenced this action in 2003, claiming, inter alia, that the defendant had engaged in an unfair trade practice by requiring its appraisers to use artificially low labor rates when estimating the cost of auto body repairs. The evidence presented at trial established that the appraisers, when negotiating with independent auto body repair shops on behalf of the defendant, used the hourly labor rate that the defendant paid to shops that were part of the defendant's direct repair program (DRP). Under this program, in return for a steady stream of customer referrals, auto body repair shops contractually agreed to perform repairs at an hourly labor rate set by the defendant. In 2000, that rate was approximately $41 per hour. In 2009, at the time of trial, the rate had increased

to approximately $46 per hour. The DRP hourly labor rate was significantly lower than the hourly labor rates that were posted in the plaintiff auto body shops[6] but were equal to the rates that other insurance companies in Connecticut paid for auto body repair services. At the time of trial, the plaintiffs' posted labor rates were in the range of $65 to $78 per hour. It also is undisputed that, with respect to the auto body repair services purchased in this state, almost all of those services are purchased by insurance companies.[7] Thus, as the plaintiff auto body shops conceded at trial, because virtually all of their business is insurance related, it is exceedingly rare for them to be paid their posted hourly labor rates. For example, one shop owner testified that he could recall only one customer ever paying him the posted hourly rate. The plaintiff auto body shops adduced testimony that their posted rates nevertheless reflect the true value of their labor, and what they would receive if the defendant and other insurance companies were not, by virtue of their market power, suppressing the hourly labor rate. Testimony presented by the plaintiff auto body shops also established that they agree to work for the DRP rate because they know that, if they do not, their competitors will, and they cannot afford to lose the business. As one shop owner put it, "[i]f I said, I'm not going to do it, that car would just go down the street . . . ." Another owner testified that, if he started demanding that customers pay him the posted rate, he "[would] have an empty shop."

The evidence at trial further established that the hourly labor rate for auto mechanical service work in Connecticut, the vast majority of which is purchased by consumers rather than by insurance companies, is almost twice that of auto body repair work, even though both types of repairs require comparable training, skills and equipment. Mike O'Mara, a licensed appraiser who worked for the defendant for twenty years, testified that, if the defendant had allowed him to do so, he would have used a higher hourly labor rate when estimating the cost of auto body repairs because he believed the prevailing rate was too low, a state of affairs that he attributed to the ability of the insurance companies to effectively dictate that rate. O'Mara testified that, if he and an auto body repair shop could not agree on a labor rate, he would call his supervisor, who would either authorize an increase or tell the shop that the insured would have the repair done elsewhere.

In 2002, O'Mara and three of his colleagues wrote a letter to the attorney general, expressing concern that they could be exposing themselves to liability by using the prevailing labor rate in their negotiations with independent auto body repair shops because, in their view, § 38a-790-8 required them to write estimates that were fair and reasonable, and they did not believe that the prevailing rate was fair and reasonable.[8] O'Mara subsequently met with representatives of the state Insurance

Department (department), which assured him that he could continue using the prevailing rate when negotiating on behalf of the defendant. At the time of trial, O'Mara, who by then was working as an appraiser for one of the plaintiff auto body shops, testified that, although he no longer worked for the defendant, he still used DRP labor rates when estimating the cost of auto body repairs and did not believe that he was violating § 38a-790-8 in doing so.

At the close of evidence, the trial court instructed the jury that, to prevail on their CUTPA claim, the plaintiffs were required to prove that the defendant's practices violated at least one prong of the so-called "cigarette rule," which is the test that this court has adopted for determining liability under CUTPA.[9] Specifically, the court stated: "Certain guidelines have been established as to what constitutes an unfair trade practice under CUTPA. The plaintiffs must establish that one or more of the defendant's alleged practices [meet] at least one of the three following criteria: (1) it offends public policy, as it has been established by statutes, the common law or other established concept of unfairness; or (2) it is immoral, unethical, oppressive or unscrupulous; or (3) it causes substantial injury to consumers, competitors or other business persons. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or to a lesser extent it meets all three."

With respect to the first criterion, the court explained that the plaintiffs were relying on three indicia of public policy to support their claim that the defendant's labor rate practices violated CUTPA. The first such policy, the court explained, is found in General Statutes § 38a-816, a provision of the Connecticut Unfair Insurance Practices Act (CUIPA), General Statutes § 38a-815 et seq., that includes within the scope of unfair insurance claim settlement practices, "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear . . . ." General Statutes § 38a-816 (6) (F). The second policy, the court stated, is found in § 38a-790-8, the code of ethics for motor vehicle physical damage appraisers, which requires an appraiser to "approach the appraisal of damaged property without prejudice against, or favoritism toward, any party involved in order to make fair and impartial appraisals," to "disregard any efforts on the part of others to influence his judgment in the interest of the parties involved," and to "prepare an independent appraisal of damage." Regs., Conn. State Agencies § 38a-790-8 (2) through (4). The third policy, the court stated, is found in certain guidelines that the department has issued to assist insurance companies in determining appropriate hourly labor rates to pay independent auto body repair shops. See Insurance Department, Insurance Depart-

ment Guidelines Concerning Labor Rates (January 29, 2007), available at http://www.ct.gov/cid/lib/cid/ GuidelinesJan292007.pdf (last visited July 8, 2015). The court also explained, however, that the introduction to those guidelines, entitled "Scope and Methodology," provides: " 'To be clear, the [d]epartment has no statutory or regulatory authority to regulate [l]abor [r]ates. These guidelines are being issued in response to requests to advise insurers and auto body repair shops on what the [d]epartment considers to be the "best practices" with regard to the setting of [l]abor [r]ates.' " The court further explained that the guidelines then identify specific factors that the department "encourages" insurance companies to consider when negotiating hourly labor rates, including, inter alia, the cost of doing business in the geographic area where a shop is located, whether the shop is an independent auto body repair shop or a DRP shop, and the prevailing labor rates in the geographic area where the shop is located.

In the course of its deliberations, the jury submitted two questions to the court concerning § 38a-790-8. First, the jury inquired whether § 38a-790-8 governs an appraiser's determination of hourly labor rates because the regulation provides that an appraiser must approach the appraisal of damaged property without prejudice against, or favoritism toward, any party, but does not say anything about labor rates. Second, the jury asked whether the words "party involved" and "parties," as used in the regulation, refer to insureds and insurers only, or to auto body repair shops, as well. In response to these questions, the trial court instructed the jury in relevant part as follows: "Section 38a-790-8 is a regulation of the [department] promulgated by the [Insurance Commissioner (commissioner)]. All administrative regulations must be authorized by enabling legislation. In this case, the legislat[ure] has required that any person acting as an appraiser for motor vehicle physical damage claims on behalf of any insurance company or firm or corporation engaged in the adjustment or appraisal of motor vehicle claims must be licensed every two years by the . . . commissioner. That statute, which is § 38a-790 . . . then provides [that] the commissioner may adopt reasonable regulations concerning standards for qualifications, suspension or revocation of such licenses and the methods by which licensees shall conduct their business. . . .

"The regulation you have asked about, § 38a-790-8, is part of a series of regulations entitled 'Conduct of Motor Vehicle Physical Damage Appraisers.' And § 38a-790-8 is the code of ethics, which specifies certain requirements for the conduct of appraisers. . . . It is not a code of conduct for insurance companies generally [or] for auto body repair shops. . . .

"It is, therefore, the conduct of the licensed appraiser that is regulated. This regulation expresses a public

policy that licensed appraisers must conduct fair and honorable dealings without prejudice against or favoritism toward any party involved in the appraisal process and must disregard any efforts on the part of others to influence [their] judgment. . . .

"My answer [to your first question] is an appraiser's responsibility to appraise is not limited solely to damaged property. He or she must assess the extent of physical damage and also appraise the cost of repairing that damage, which necessarily involves estimating the cost of replacement of parts, the number of hours needed to complete the repairs, and a reasonable hourly rate to be applied to those hours.

"Now, you have . . . a separate exhibit from the one you asked about, a statement from the commissioner . . . [in which] he says, to be clear, 'the department has no statutory or regulatory authority to regulate labor rates.' An insurance company such as [the defendant], therefore, has a right to state a labor rate [that] it is willing to pay to repair damage to the automobile[s] of its insureds or other claimants. The issue you must determine is whether or not, or to what extent, the public policy of the regulation . . . is offended by [the defendant's appraisers] . . . . In that regard, you can consider whether or not any conduct of [the defendant] has interfered with the independence of the . . . appraisers or has caused prejudice against or favoritism toward any party involved in the appraisal procedure, or whether or not any . . . appraiser has disregarded any efforts on the part of others, which . . . could include the efforts of an insurance company such as [the defendant], to influence his or her judgment in the interest of the parties involved.

"If you . . . do find that appraiser independence has been interfered with or has caused favoritism toward or prejudice against any party involved or that an appraiser has disregarded any efforts by any party such as but not limited to an insurance company to influence his or her judgment, then you may find on that basis that the public policy of . . . § 38a-790-8 has been offended.

"Now, I just made reference several times . . . to the term 'parties involved,' which brings me to your [next question, regarding the meaning of that term]. . . . My answer is [as] follows. The regulatory scheme of [§§ 38a-790-1 through 38a-790-8 of the Regulations of Connecticut State Agencies]—not just § [38a-790-8] . . . but the whole regulatory scheme—is broad. It implicates the appraisers' dealings with insureds, with other drivers or claimants involved in accidents with the insureds, insurance companies and repair shops. All [of] the foregoing would be included within the ambit of the term 'parties involved.' "

The defendant took exception to the trial court's instruction that § 38a-790-8 applies to an appraiser's

determination of hourly labor rates and that the term "party," as used in the regulation, encompasses auto body repair shops. The defendant contended that the regulation was not concerned with the determination of labor rates because the agency that promulgated it has no statutory or regulatory authority with respect to such rates. The defendant further maintained that, for purposes of applying § 38a-790-8, the term "parties involved" can refer only to the insurer and the insured because an appraiser could not possibly owe a duty of impartiality or reasonableness to the very shops with whom he is negotiating on behalf of an employer.

The jury returned a verdict in favor of the plaintiffs, stating in a response to interrogatories that the plaintiffs had proven by a preponderance of the evidence that the defendant's hourly labor rate practices offend the public policy embodied in § 38a-790-8. The jury, however, expressly rejected the plaintiffs' claim that the defendant's conduct offended the public policy embodied in CUIPA or the department's guidelines for determining hourly labor rates. The jury also rejected the plaintiffs' claim that the defendant's labor rate practices satisfied the second and third prongs of the cigarette rule. Specifically, the jury found that the defendant's hourly rate practices were not immoral, unethical, unscrupulous or oppressive, and did not cause substantial injury to the plaintiffs that was not outweighed by the countervailing benefits to consumers and competition.

Thereafter, the defendant filed a motion to set aside the verdict and for judgment notwithstanding the verdict, arguing, inter alia, that liability under CUTPA may not be predicated on a public policy reflected in a regulation or in the regulation's penumbra that does not apply to insurance companies and does not proscribe the conduct at issue. The defendant also asserted that the plaintiffs had failed to meet their burden under the cigarette rule because, under that test, a trade practice is deemed to be unfair based on the degree to which it meets one prong of the rule or because, to a lesser extent, it meets all three, and the plaintiffs in the present case had failed to establish that the defendant's conduct violated any prong of the test.[10] The trial court rejected these arguments and thus denied the defendant's motion.

The defendant subsequently filed a motion for reconsideration and for sanctions based on the plaintiffs' failure to disclose two letters that the commissioner previously had written to the attorney general, explaining the scope and meaning of § 38a-790-8. The defendant argued that the letters expressly addressed the pivotal issue in this case, as reflected in the jury's two questions during deliberations, and made clear that, as a matter of law, § 38a-790-8 does not support the plaintiffs' CUTPA claim.

With respect to the two letters, the record reveals that, while this case was pending in the trial court, the association contacted the attorney general and asked him to bring a parallel CUTPA enforcement action against the defendant based on the defendant's purported violation of § 38a-790-8. See General Statutes § 42-110m (providing for CUTPA enforcement actions by attorney general). The attorney general, in turn, wrote to the commissioner, requesting authorization to commence legal action against the defendant and any other insurers "whose appraisers have [a] . . . bias when determining the cost of repairs" and who "are failing to negotiate reasonable and fair prices for [such] repairs." Letter from Richard Blumenthal, Attorney General, to Thomas R. Sullivan, Insurance Commissioner (August 27, 2007) p. 1. By letter dated September 27, 2007, the commissioner declined the attorney general's request, explaining that § 38a-790-8, and its enabling statute, § 38a-790, did not support such an action. Specifically, the commissioner stated: "In order to construe the statute and the regulation together, one must be cognizant of the scope of the motor vehicle physical damage appraiser's license. The appraiser does not have any authority, pursuant to his license, to establish a labor rate for auto body repair work. Appraisers do not have particular expertise in the economics and development of labor rates, and those matters are not part of their licensing qualification. Their expertise is limited to an assessment of the auto parts in need of repair and the number of hours to do the auto body repair job. The rate at which a body shop is to be paid is handled by negotiation between the insurer and the body shop. The [c]ode of [e]thics as described . . . must be analyzed consistent with the work the motor vehicle physical damage appraiser is licensed to perform and consistent with its enabling legislation that specifically contemplates an appraiser operating on behalf of an insurance company." Letter from Thomas R. Sullivan, Insurance Commissioner, to Richard Blumenthal, Attorney General (September 27, 2007) p. 5.

On February 25, 2008, the commissioner sent a second letter to the attorney general, in which he stated in relevant part: "Please accept the following in response to your request for additional information on the manner in which steering complaints are investigated and the role of the appraiser in disputes concerning auto body physical damage. . . .

* * *

"As the [d]epartment has said in the past, it does not have any authority or expertise to determine the rate at which insurance companies (or the appraisers employed by them) should be paying auto body shops. . . . We are not and should not be the ultimate arbiter of what a 'fair' labor rate should be in a specific

instance. . . .

"The rate an auto body shop is paid by an insurer can be determined in two ways: (1) through negotiation between the appraiser (who is lawfully allowed to work for an insurer pursuant to . . . § 38a-790 and [the] accompanying regulations) and the body shop, and (2) by contract entered into by an insurer and an auto body shop, commonly referred to as a direct repair program or DRP. Determining the appropriate labor rate to be paid under a contractual arrangement can be done with relative ease. On the other hand, the negotiated labor rate, by its very nature, tends to be more contentious. As you know, a negotiation does not necessarily mean that an appraiser and an auto body shop split the difference between the shop's posted rate and the rate offered by the insurer.

"When appraisers are determining the labor rate they will offer to the auto body shop during a negotiation, it is my understanding that they consider the labor rate paid in the marketplace in general, including those paid to DRPs with whom the insurer has a contractual relationship. This would appear to explain why the labor rate is relatively consistent [statewide].

"I would also like to point out at this time that the [d]epartment does not believe there is anything improper about DRP contracts. We believe that they are legally permitted based on the informal opinion we received from your office related to auto glass repair networks and case law throughout the nation . . . . In fact, courts have sanctioned [DRP] shop contractual agreements as being [procompetitive] and not [in violation] of antitrust laws. Such [DRP] agreements have the [procompetitive] effect of keeping auto repair costs as low as possible for consumers because insurers can charge . . . lower insurance rates and premiums than they might otherwise be allowed to charge if they were required to pay the shop's posted labor rate. I do not believe that it is prudent policy to sacrifice the interests of the general public in Connecticut, which benefits from one of the healthiest auto insurance markets nationwide, for the interests of a handful of auto body shops [that] are finding it difficult to compete with DRPs, particularly when some have made their own business decision to not become a DRP." Letter from Thomas R. Sullivan, Insurance Commissioner, to Richard Blumenthal, Attorney General (February 25, 2008) pp. 1–2.

The commissioner further observed that, in his opinion, "a small, but vocal, number of auto body repair shop owners are trying to apply pressure to insurers to pay their posted labor rate, much to the detriment of [the insurers'] policyholders. Requiring companies to pay a body shop's posted labor rate would not only be outside the [d]epartment's jurisdiction and bad for consumers, but could also implicate the [antitrust] stat-

utes, including the prohibitions on price fixing. . . .

"The [association] has also pointed to the [d]epartment's regulation governing the code of conduct for [appraisers] as justification for the payment of a higher labor rate by insurers. It is the [d]epartment's position that this regulation is intended to protect consumers from unscrupulous appraisers seeking to charge them more for auto body repair work than is economically justified in an arms-length transaction. A handful of auto body repair shop owners, however, have sought to use this regulation to demand that insurers pay [their] posted labor rate[s]. In effect, these few auto body shops would like the [d]epartment to use this regulation as a 'sword' to protect their own economic interests in a competitive industry rather than as a 'shield' for the protection of insureds. We do not believe that taking such action would be in the best interest of the insurance buying public and decline to enforce it in the manner suggested by [the association]." (Emphasis omitted.) Id., pp. 2–3.

In its memorandum of decision on the defendant's motion for reconsideration and for sanctions, the trial court concluded that the plaintiffs had committed a discovery violation by virtue of their failure to disclose the commissioner's September 27, 2007 letter (2007 letter). With respect to that violation, the court found that the plaintiffs had knowledge of the 2007 letter but not the commissioner's February 25, 2008 letter, and that they had violated their continuing duty of disclosure by failing to bring the 2007 letter to the defendant's attention. With respect to the motion for reconsideration, the court treated it as a petition for a new trial based on newly discovered evidence. The court explained that, in order to prevail on such a petition, the defendant must prove that the 2007 letter (1) could not have been discovered sooner in the exercise of due diligence, (2) was material to the issues at trial, (3) was not cumulative of other evidence, and (4) was likely to produce a different result in the event of a new trial. The court then concluded that the defendant could not satisfy the first and fourth prongs of this test. In particular, the court determined that the 2007 letter was not newly discovered because the defendant could have obtained it in the exercise of due diligence by filing a Freedom of Information Act request with the department or the Office of the Attorney General, requesting the disclosure of any documents relating to § 38a-790-8.

The court also concluded that the 2007 letter would not have led to a different result at trial because there was nothing in it that would have caused the court to instruct the jury any differently with respect to the law. The court explained: "The jury was well aware that the [d]epartment . . . has no statutory or regulatory authority to regulate hourly labor rates at body shops. . . .

"It must be [noted] that this is not a regulatory proceeding [in which] someone is accused of violating the regulation. If that were the case, [the defendant] could not be the respondent. The regulation does not directly control the conduct of an insurance company. It regulates the conduct of licensed appraisers. . . . This case is a claim of an unfair trade practice by an insurance company, which is the employer of licensed appraisers. By established case law—the cigarette rule—an unfair trade practice can be found when conduct of the defendant offends—not necessarily violates—the public policy expressed [in] a statute or regulation or other established concept of unfairness. An offense merely to the penumbra of that public policy can be sufficient. The public policy or the penumbra of the public policy of the code of ethics regulation is deeply rooted in the appraiser's independence from outside influence—even from the company that employs the appraiser. He or she must approach the appraisal of damaged property without . . . favoritism toward any party involved . . . and disregard any efforts on the part of others to influence his [or her] judgment in the interest of the parties involved. In this larger sense of offense to the public policy or its penumbra, any party who interferes with the appraiser's independence could be committing an unfair trade practice in violation of CUTPA. In that sense, labor rates are involved, and body shops with whom appraisers negotiate labor rates are interested parties. Despite what [the commissioner] says in his letter, appraisers have to determine labor rates. There is no other way the appraiser could get to the bottom line dollar amount of the appraisal. If the [2007] letter means to say that appraisers have nothing at all to do with labor rates, the court would have disregarded the letter on that point. . . .

"So, even though the [d]epartment . . . cannot regulate labor rates in the sense that it cannot take action against an appraiser based on the amount of the labor rate [that] he has determined to use, it is undisputed that the appraiser must make that determination of a labor rate [that] reflects the cost of repairing the car, and, in making that determination, [t]he code of ethics requires him to do so fairly and honestly without outside influence from anyone. That policy is offended by anyone who interferes or attempts to interfere with that independence. The court therefore feels that there was no error in the answers given to the jury questions and would stay with those answers in any future proceeding, and would not change its ruling [on the motion to set aside the verdict and for judgment notwithstanding the verdict]."[11]

Thereafter, the trial court granted the plaintiffs' motion for a permanent injunction, precluding the defendant from interfering with the independent judgment of the defendant's appraisers and from taking

or threatening to take any adverse employment action against them on the basis of their determination of hourly labor rates.[12] The trial court also declined to modify the jury award of $14,765,556.27 in compensatory damages or the award of punitive damages in the amount of $20,000,000.

On appeal, the defendant claims that the trial court improperly failed to acknowledge that CUTPA liability for insurance related business practices may not be predicated on conduct that does not violate CUIPA, as this court recently confirmed in *State* v. *Acordia, Inc.*, 310 Conn. 1, 33–35, 37–38, 73 A.3d 711 (2013) (*Acordia*). The defendant further claims that, even if *Acordia* does not bar the plaintiffs' CUTPA claim as a matter of law, that claim still must fail because the defendant's labor rate practices do not violate § 38a-790-8. To the contrary, the defendant argues, the statutory and regulatory scheme of which § 38a-790-8 is a part contemplates and condones the defendant's labor rate practices, and that scheme consistently has been interpreted by the agency charged with its enforcement, namely, the department, as permitting those practices.[13] The plaintiffs contend that, although the conduct at issue does not violate CUIPA, *Acordia* held out the possibility that insurance related conduct that does not violate CUIPA may still violate CUTPA if it offends some other law regulating the insurance industry, and the trial court properly determined that § 38a-790-8 is such a provision. We agree with the defendant that neither its conduct nor the conduct of its appraisers offends § 38a-790-8 or any other public policy of this state.

The following legal principles guide our analysis of the defendant's claim. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . [CUTPA] provides for more robust remedies than those available under analogous common-law causes of action, including punitive damages . . . and attorney's fees and costs, and, in addition to damages or in lieu of damages, injunctive or other equitable relief. . . . To give effect to its provisions, [General Statutes] § 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Marinos* v. *Poirot*, 308 Conn. 706, 712-13, 66 A.3d 860 (2013). CUIPA, which specifically prohibits unfair business practices in the insurance industry and defines what constitutes such practices in that industry; see General Statutes § 38a-816; does not authorize a private right of action but, instead, empowers the commissioner to enforce its provisions through administrative action. See General Statutes §§ 38a-817 and 38a-

818. "In *Mead* v. *Burns*, 199 Conn. 651, 663, 509 A.2d 11 (1986), [however] this court determined that individuals may bring an action under CUTPA for violations of CUIPA. In order to sustain a CUIPA cause of action under CUTPA, a plaintiff must allege conduct that is proscribed by CUIPA." *Nazami* v. *Patrons Mutual Ins. Co.*, 280 Conn. 619, 625, 910 A.2d 209 (2006). Thus, under *Mead*, "if a plaintiff brings a claim pursuant to CUIPA alleging an unfair insurance practice, and the plaintiff further claims that the CUIPA violation constituted a CUTPA violation, the failure of the CUIPA claim is fatal to the CUTPA claim." *State* v. *Acordia, Inc.*, supra, 310 Conn. 31.

In *Acordia*, after observing that *Mead* had "strongly suggested" but not expressly resolved whether the "legislative determinations as to unfair insurance practices embodied in CUIPA are the exclusive and comprehensive source of public policy in this area"; id., 35; we concluded that, as a general rule, a plaintiff cannot bring a CUTPA claim alleging an unfair insurance practice unless the practice violates CUIPA.[14] Id., 31, 35–37. "Because CUIPA provides the exclusive and comprehensive source of public policy with respect to general insurance practices, we conclude[d] that, unless an insurance related practice violates CUIPA or, arguably, some other statute regulating a specific type of insurance related conduct, it cannot be found to violate any public policy and, therefore, it cannot be found to violate CUTPA." Id. 37.

On appeal, the plaintiffs contend that, even though the defendant's labor rate practices are not prohibited by CUIPA, § 38a-790-8 provides a proper basis for liability under CUTPA. More specifically, the plaintiffs argue that the holding in *Acordia* "should be extended to reach the conduct complained of [in the present case], which reflects a clear violation of the deeply-rooted public policy mandating fair and unbiased appraisals by physical damage appraisers."

Although § 38a-790-8 reasonably may be characterized as regulating insurance related conduct insofar as it prescribes a standard of conduct for appraisers who estimate the cost to insurers of auto body repairs, we fully agree with the defendant that that provision simply does not purport to regulate the conduct at issue in the present case. Cf. *Mead* v. *Burns*, supra, 199 Conn. 665 ("[a]lthough . . . CUTPA may authorize a cause of action that builds [on] the public policy embodied in specific statutory provisions, such a CUTPA claim must be consistent with the regulatory principles established by the underlying statutes"). To the contrary, as the trial court instructed the jury, insurance companies in this state have the right to negotiate the hourly labor rate that they are willing to pay for auto body repairs and to refuse to give their business to an auto body repair shop with which they are unable to agree on

such a rate. They also are entitled, under § 38a-790 (a); see footnote 2 of this opinion; and its accompanying regulations, to employ appraisers to negotiate the labor rate for such repairs on their behalf. Notably, the plaintiffs do not claim otherwise. In such circumstances, it would be an anomalous result, to say the least, if we were to endorse the position of the plaintiffs that every time an insurance company exercises its right to negotiate with an auto body repair shop for an hourly labor rate, and then proceeds to have its appraisers estimate the cost of repairing its insureds' vehicles on the basis of that agreed on rate, it is somehow committing an unfair trade practice under CUTPA. As the commissioner cogently explained in his 2007 and 2008 letters to the attorney general on the subject, there is a perfectly logical and reasonable way to reconcile the defendant's right to negotiate labor costs with the appraiser's ethical duty to "disregard any efforts on the part of others to influence his judgment in the interest of the parties involved"; Regs., Conn. State Agencies § 38a-790-8 (3); and that is to recognize that the appraiser's role is limited to an assessment of the auto parts in need of repair and the number of hours to complete the auto body repair job, whereas the rate that an auto body repair shop is to be paid is the subject of negotiation between the insurer and the shop, with the appraiser sometimes acting as a negotiator on behalf of his or her employer, the insurer. There is nothing about this division of authority that is suspect or unfair, or that otherwise contravenes the requirement of § 38a-790-8 that appraisers conduct themselves in an upstanding and independent manner.

The plaintiffs make no effort to defend the trial court's contrary understanding of the relevant regulatory scheme—a primary focus of which is to protect the consumer of auto body repair services—except to assert, in conclusory fashion, that the court's instructions to the jury—in particular, the instructions suggesting that it may be unfair or unreasonable for an appraiser to use a predetermined or negotiated hourly rate in arriving at an estimate of the cost of auto body repairs—represent "the [o]nly [r]easonable [i]nterpretation" of that scheme. In support of their contention, the plaintiffs also assert that the trial court properly concluded that the opinions expressed in the commissioner's letters were entitled to no deference because they were not promulgated in accordance with the appropriate rule-making procedures, they bear no indication of being an official agency interpretation of § 38a-790-8, and they have never been subject to judicial review. The plaintiffs, however, do not explain why, even if the opinions that the commissioner espouses in those letters are not entitled to any deference by this court, the interpretation of § 38a-790-8 set forth therein is in any way unreasonable, unworkable or unjust. For the reasons outlined in the commissioner's letters, and

as we previously have indicated, quite the opposite is true: it would be patently unreasonable, and result in an inherently contradictory regulatory scheme, for us to conclude both that the defendant is lawfully permitted to determine the hourly labor rate that it is willing to pay for auto body repairs and that the defendant's appraisers are ethically required to disregard that determination when negotiating on the defendant's behalf. See, e.g., *Barrett* v. *Montesano*, 269 Conn. 787, 797, 849 A.2d 839 (2004) ("we interpret statutes to avoid bizarre or nonsensical results" [internal quotation marks omitted]). Indeed, we are unable to discern why appraisers, when negotiating for the cost of auto repairs on behalf of their employers, would ever owe a duty of impartiality to the auto body repair shops with whom they are negotiating. Under our regulatory provisions, those businesses are deemed to be capable of representing their own interests, and certainly are under no obligation to accept insurance related work that is not sufficiently remunerative. We therefore agree with the defendant that the trial court incorrectly concluded that § 38a-790-8 supports the plaintiffs' CUTPA claim alleging unfair labor rate practices.[15] In light of that conclusion, the plaintiffs' CUTPA claim cannot stand, and the defendant is therefore entitled to judgment as a matter of law.[16]

The judgment is reversed and the case is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.

[1] Artie's Auto Body, Inc., A & R Body Specialty, and Skrip's Auto Body are businesses licensed to perform auto body repairs in Connecticut. We refer to these plaintiffs collectively as the plaintiff auto body shops. The association is a not-for-profit association comprised of more than 100 automobile body repair shops in Connecticut dedicated to the advancement of the automobile body repair industry.

[2] General Statutes § 38a-790 (a) provides in relevant part: "No person shall act as an appraiser for motor vehicle physical damage claims on behalf of any insurance company or firm or corporation engaged in the adjustment or appraisal of motor vehicle claims unless such person has first secured a license from the Insurance Commissioner. . . . The commissioner may adopt reasonable regulations concerning standards for qualification, suspension or revocation of such licenses and the methods by which licensees shall conduct their business."

[3] Section 38a-790-8 of the Regulations of Connecticut State Agencies provides: "Every appraiser shall: (1) Conduct himself in such a manner as to inspire public confidence by fair and honorable dealings; (2) approach the appraisal of damaged property without prejudice against, or favoritism toward, any party involved in order to make fair and impartial appraisals; (3) disregard any efforts on the part of others to influence his judgment in the interest of the parties involved; (4) prepare an independent appraisal of damage. No appraiser shall: (A) Receive directly or indirectly any gratuity or other consideration in connection with his appraisal services from any person except his employer or, if self-employed, his customer; (B) traffic in automobile salvage if such salvage is obtained in any way as a result of appraisal services rendered by him."

[4] The plaintiffs also alleged that the defendant improperly had steered its insureds to a preferred provider network of auto body repair shops that charged labor rates well below reasonable market value, in violation of General Statutes § 38a-354 (b) (1), which prohibits insurance companies from "requir[ing] any insured to use a specific person for the provision of automobile physical damage repairs . . . ." The jury found in favor of the defendant on this claim, and the plaintiffs have not challenged that finding on appeal.

[5] The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[6] Auto body repair shops in Connecticut are required by law to post their hourly labor rate in a visible location on their premises. See General Statutes § 14-65i (b).

[7] Robert Skrip, the owner of Skrip's Auto Body, acknowledged at trial that "almost all of [his] business comes from insurance companies . . . ." Harold Platz, the owner of Artie's Auto Body, Inc., testified that his business is "99 percent insurance." Michael Walsh, the owner of T & J Auto Body of East Hartford, also testified that "99 percent of [his] work, maybe more, is . . . insurance work."

[8] The letter provided in relevant part: "Considering the widening gap between [auto body] repair rates and mechanical service rates, we [cannot] honestly say that we believe the current prevailing rate of [$40 to $42 per] hour is fair. In fact, we believe that [it] is very low due to [i]nsurer influence, and not due to market influence.

"The problem is obvious. If we were to write estimates at a rate we believe to be fair and reasonable, as we believe the law mandates, we would be terminated." (Internal quotation marks omitted.) Letter from Timothy Davis et al. to Richard Blumenthal, Attorney General (February 12, 2002) p. 1.

[9] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

"[I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]omission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350–51, 994 A.2d 153 (2010).

[10] In addition, the defendant maintained that the undisputed evidence also demonstrated that its labor rate practices, which keep such rates relatively low, actually benefited consumers because they make it possible for it and other insurance companies to charge lower premiums.

[11] As a sanction for failing to disclose the 2007 letter, the trial court ordered the association to reimburse the defendant for one half of its reasonable attorney's fees and costs incurred in connection with the filing and presentation of its motion for reconsideration and for sanctions.

[12] The trial court subsequently granted the defendant's motion for a stay of the permanent injunction.

[13] On appeal, the defendant also claims that it was improper for the trial court to instruct the jury that the cigarette rule is the proper standard for determining whether conduct violates CUTPA because the federal courts have abandoned that rule in favor of a more stringent test known as the substantial unjustified injury test. See 15 U.S.C. § 45 (n) (2012). Under that standard, an act or practice is unfair if it causes substantial injury, it is not outweighed by countervailing benefits to consumers or competition, and consumers themselves could not reasonably have avoided it. See 15 U.S.C. § 45 (n) (2012). Approximately ten years ago, in *Glazer* v. *Dress Barn, Inc.*, 274 Conn. 33, 873 A.2d 929 (2005), this court observed that, "[a]lthough we consistently have followed the cigarette rule in CUTPA cases . . . when interpreting 'unfairness' under CUTPA, our decisions are to be guided by the interpretations of the Federal Trade Act by the Federal Trade Commission and the federal courts. See General Statutes § 42-110b [b]. Review of those authorities indicates that a serious question exists as to whether the cigarette rule remains the guiding rule utilized under federal law." Id., 82 n.34. Recently, in *Ulbrich* v. *Groth*, 310 Conn. 375, 422–29, 78 A.3d 76 (2013), we declined to review a claim that we should abandon the cigarette rule in favor of the substantial unjustified injury test because the claim was not preserved. Since *Glazer*, the legislature has given no indication that it disapproves of our continued use of the cigarette rule as the standard for determining unfairness under CUTPA, notwithstanding the federal courts' aban-

donment of that rule in favor of the substantial unjustified injury test and the legislative directive in § 42-110b (b) that we are to be guided by federal law when construing CUTPA. In light of our conclusion in the present case that the plaintiffs' CUTPA claim fails even under the more lenient cigarette rule, it is unnecessary for us to decide whether that rule should be abandoned in favor of the federal test. Because of the likelihood that this court will be required to address this issue in a future case, however, the legislature may wish to clarify its position with respect to the proper test.

[14] In reaching that determination in *Acordia*, we explained that "the legislative history of CUIPA reveals that the legislature intended to set out specifically the types of actions that constitute unfair insurance practices in a highly detailed manner . . . [and] viewed accomplishing that task as essential to the underlying purpose of CUIPA: enabling the commissioner to better protect consumers. The many subsequent amendments incorporating additional practices as violative of CUIPA demonstrate an ongoing legislative effort to keep the list of prohibited practices as current as possible and provide further evidence of the legislature's intent to provide in CUIPA a comprehensive list of unfair insurance practices. . . . The legislative history of CUIPA, therefore, demonstrates that the legislature intended to occupy the field of defining unfair insurance practices, thereby precluding courts from incorporating common-law principles as a basis for finding an unfair insurance practice." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Acordia*, *Inc.*, supra, 310 Conn. 36.

[15] Because we conclude that § 38a-790-8 does not support the plaintiffs' CUTPA claim, it is unnecessary to address the defendant's contention that the trial court abused its discretion in awarding punitive damages and in granting the plaintiffs' motion for a permanent injunction.

[16] The plaintiffs argue that, in the event that the defendant is successful on appeal, this court should order a new trial rather than direct the trial court to render judgment in favor of the defendant because the plaintiffs were unfairly prejudiced by the trial court's exclusion of certain evidence that they sought to introduce in support of their labor rate claim under CUTPA. Even if we were to assume, arguendo, that the trial court had abused its discretion in excluding this evidence, that error is immaterial in light of our determination that the defendant's labor rate practices do not violate public policy.

———————————